No. 2--08--0831    Filed: 10-16-09

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| DONALD L. McLAUGHLIN, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 07--L--368 |
| | ) | |
| STERNBERG LANTERNS, INC., d/b/a | ) | |
| Sternberg Vintage Lighting, | ) | |
| and JOSEPH WALDAU, | ) | Honorable |
| | ) | Richard M. Stock, |
| Defendants-Appellees. | ) | Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the opinion of the court:

The plaintiff, Donald McLaughlin, worked for the defendant Sternberg Lanterns, Inc., d/b/a

Sternberg Vintage Lighting (the defendant), as vice president of sales. On October 12, 2006, the

defendant terminated the plaintiff's employment due to the plaintiff's failure to follow direct orders

as well as due to shortcomings with his interpersonal skills and management style. The plaintiff

subsequently filed a complaint in the circuit court of Du Page County, seeking to recover unpaid

compensation. After both parties filed motions for summary judgment, the trial court granted the

defendant's motion for summary judgment. The plaintiff appeals from that order.

The following relevant facts are taken from the record. The defendant manufactures and sells

traditional and architectural lighting and relies on independent agents to sell its products to end users.

The plaintiff began working for the defendant in 1997, focusing on sales. On June 18, 2001, the

defendant promoted the plaintiff from national sales manager to vice president of sales. As the vice president of sales, among other duties and responsibilities, the plaintiff was responsible for managing the entire sales department, managing and motivating the independent agents, and attending trade shows to promote the defendant's products.

At the time of his promotion, the plaintiff received from the defendant Joseph Waldau, the defendant's president and chief executive officer, a one-page agreement that outlined the financial terms of the new position. That agreement provided in pertinent part:

"Your base salary is $100,000 per year with a review in 12 months. The sales performance bonus is based on the following program:

You will earn a bonus of $2,000 for every 1% increase in released incoming orders, thus:

If Incoming Sales increase 5% per year, your Bonus will be $10,000, or

If Incoming Sales increase 10% per year, your Bonus will be $20,000, or

If Incoming Sales increase 15% per year, your Bonus will be $30,000, or

If Incoming Sales increase 20% per year, your Bonus will be $40,000.

* * *

We will guarantee your base salary for (6) months for early termination by the company, unless the company has determined your termination is for substantial cause, for which the company will guarantee your base salary for 60 days."

Thereafter, the plaintiff received yearly increases in his base salary pursuant to the agreement. On June 26, 2006, after the plaintiff's annual review the defendant increased his base salary to $113,724 per year. In addition, the sales performance bonus was amended to award the plaintiff

$3,000 (instead of $2,000) for every 1% incoming sales increase over the prior year's total, year-end incoming sales.

In 2001, shortly after the defendant promoted the plaintiff to vice president of sales, several of the defendant's employees confronted Waldau and complained that the plaintiff was lazy, haughty, and a "demotivator," lacked appropriate interpersonal skills, and did not deserve to be a vice president for the defendant. In November 2003, Debra Cusick, the east region sales manager, resigned in a letter submitted to Waldau. The letter complained of the plaintiff's ineptitude and explained that the plaintiff was the primary reason for her resignation. In January 2004, west region sales manager Paul Mitchell submitted to Waldau a memorandum voicing his concern that the plaintiff fostered widespread resentment and apathy and that morale and motivation amongst the sales force were nonexistent. The plaintiff's 2005 performance review specifically referred to his interpersonal skills and stated that he needed to "improve relationships with regional managers, especially with the western regional manager" and stressed that "improving [his] internal working relationships [was] necessary for success."

On October 6, 2006, the plaintiff was to leave for a trade show in Tampa, Florida, along with the defendant's east region sales manager, Thomas Frank. Prior to leaving for the trade show, Frank informed the plaintiff that he was resigning but was willing to stay with the company for an additional two weeks and to attend the trade show. The plaintiff responded by criticizing Frank's performance and telling him that he was not performing up to the plaintiff's expectations anyway. The plaintiff further informed Frank that he did not want him to attend the trade show. Based on the plaintiff's comments, Frank rescinded his offer to remain with the company and instead indicated that his resignation would be effective at the end of the day.

Later that day, the plaintiff telephoned Waldau and told him that Frank had resigned. The plaintiff acknowledged that he had handled the resignation badly and had told Frank that his services were not needed at the trade show. Waldau was shocked by this news and told the plaintiff that Frank needed to attend the trade show. Waldau instructed the plaintiff to locate Frank immediately, to resolve their differences, and to do whatever he could to get Frank to attend the trade show.

Waldau called the plaintiff back approximately an hour later for a progress report. The plaintiff informed Waldau that he had not contacted Frank but rather had been talking on the phone with someone else. Waldau told the plaintiff that he was frustrated with him because he had not followed his instructions. Waldau then directed the plaintiff to do anything he could to convince Frank to attend the trade show.

Later that day, Waldau and the plaintiff spoke for a third time. The plaintiff indicated that he had been unable to locate Frank. Waldau instructed the plaintiff to do whatever he could, including apologizing to Frank for the plaintiff's inappropriate behavior, to convince Frank to attend the trade show. The plaintiff then left Frank a few voicemail messages. The plaintiff did not apologize in the messages, go to Frank's home to address the situation, or do anything further to rectify the matter. Frank did not attend the trade show.

Waldau subsequently discussed the plaintiff's conduct with Mitchell and one of the defendant's long-time agents, Mark Malzgar. Malzgar indicated that he did not care for the plaintiff and that every project the plaintiff became involved with went from good to bad or from bad to worse. Malzgar recounted an incident from May 2006 in which the plaintiff had humiliated him in front of the defendant's other agents at a trade show. Mitchell corroborated Malzgar's account of the incident. Mitchell further stated that numerous agents felt the same way about the plaintiff. Mitchell also stated

-4-

that he believed that the plaintiff was an inept supervisor and was the primary source of Frank's performance issues. Mitchell also reminded Waldau of the 2004 memorandum he had prepared detailing the plaintiff's incompetence as vice president of sales.

On October 12, 2006, after the plaintiff returned from the trade show, Waldau met with the plaintiff and terminated his employment. During this meeting, Waldau provided the plaintiff with a letter that explained the decision as follows:

"[Y]ou did not act in the best interest of Sternberg by being confrontational in the resignation meeting with Tom Frank, thus aggravating him to the point that he rescinded his 2 week stay and his offer to be with you at the Tampa trade show. You failed to obey direct orders from me to immediately get with Tom, have a respectful and open conversation with him, listen to his issues and hopefully seek ways to resolve those issues in order to convince him to stay. This is the most recent incidence of your failure to improve your interpersonal relationship with others.

Despite my efforts and my counsel with you over several sessions, you have failed to improve your interpersonal skills and management style. Your methods of motivation, in many cases fail and foster disrespect.

My concerns have been confirmed by conversations with some of your staff, coworkers and agents.

The most recent incident leaves me no choice but to terminate your employment immediately. I do not take this action lightly but the gravity of the situation is such that I feel it is for substantial cause. The severance pay the Company is required to pay will be paid

weekly over the next 8 weeks and each week will be equal to your normal weekly base salary."

On April 16, 2007, the plaintiff filed a complaint seeking recovery of final compensation pursuant to the Illinois Wage Payment and Collection Act (the Wage Act) (820 ILCS 115/1 et seq. (West 2006)) and for attorney fees. The plaintiff alleged that the defendant owed him a pro rata share of the 2006 performance bonus and also owed him an additional four months of separation pay because his termination was not for "substantial cause." Both parties subsequently filed cross-motions for summary judgment. On August 6, 2008, the trial court granted summary judgment in the defendant's favor. The trial court explained that the plaintiff was terminated for substantial cause and that the plaintiff's performance bonus was not guaranteed and did not accrue pro rata. The plaintiff thereafter filed a timely notice of appeal.

On appeal, the plaintiff argues that the trial court erred in granting the defendant's motion for summary judgment. Specifically, the plaintiff argues that (1) pursuant to the parties' contract and the Wage Act, he is entitled to a pro rata portion of the bonus he would have earned had his employment not been terminated; and (2) a question of fact remains as to whether the basis for his termination constituted "substantial cause."

At the outset, we note that the purpose of a motion for summary judgment is to determine whether a genuine issue of triable fact exists (People ex rel. Barsanti v. Scarpelli, 371 Ill. App. 3d 226, 231 (2007)) and that such a motion should be granted only when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law" (735 ILCS 5/2--1005(c) (West 2006)). An order granting summary judgment should be reversed if the evidence

shows that a genuine issue of material fact exists or if the judgment was incorrect as a matter of law. Clausen v. Carroll, 291 Ill. App. 3d 530, 536 (1997).

The plaintiff's first argument requires us to construe certain provisions of the Wage Act. The plaintiff insists that the bonus referred to in the parties' agreement constituted an "earned bonus" to which he is entitled pursuant to the Wage Act. In interpreting the Wage Act, this court must ascertain and give effect to the intent of the legislature. Illinois Department of Healthcare & Family Services v. Warner, 227 Ill. 2d 223, 229 (2008). The most reliable indicator of the legislature's intent is the language of the statute, which is given its plain, ordinary, and popularly understood meaning. Warner, 227 Ill. 2d at 229. Furthermore, when interpreting a statute, a court must presume that when the legislature enacted the law, it did not intend to produce absurd, inconvenient, or unjust results. Vine Street Clinic v. HealthLink, Inc., 222 Ill. 2d 276, 282 (2006).

Section 2 of the Wage Payment Collection Act provides in pertinent part:

"For all employees *** 'wages' shall be defined as any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of the calculation. Payments to separated employees shall be termed 'final compensation' and shall be defined as wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." 820 ILCS 115/2 (West 2006).

The Wage Act does not define the term "earned bonus." However, the proper definition of this term was addressed by the Illinois Appellate Court, Fifth District, in Camillo v. Wal-Mart Stores,

Inc., 221 Ill. App. 3d 614, 619 (1991). In Camillo, at issue was a benefit program that provided: " 'Our assistant managers are paid a bonus each year' " and they " 'must be on the payroll and actively working on January 31, or they will forfeit their bonus.' " The bonus was based on length of service and corporate net profit. The plaintiff's employment was terminated on December 31. After the defendant refused to pay him a pro rata share of the bonus, the plaintiff filed a complaint for it. Following a trial, the jury returned a verdict in the defendant's favor. After the trial court denied the plaintiff's posttrial motion, the plaintiff appealed, arguing that the bonus in question was an earned bonus of which he was entitled to a pro rata share under section 2 of the Wage Act. Camillo, 221 Ill. App. 3d at 616-17. The reviewing court agreed. The reviewing court found that the type of bonus at issue should be interpreted similarly to "earned vacation." The Wage Act provides that a discharged employee is entitled to the monetary equivalent of earned vacation as part of his final compensation. The reviewing court therefore determined that the plaintiff was entitled to a pro rata share of his bonus, just as he would have been entitled to a pro rata share of his vacation pay. Camillo, 221 Ill. App. 3d at 622.

No Illinois court to date has discussed the Camillo court's analysis of the term "earned bonus." However, in several cases, the United States District Court for the Northern District of Illinois has expounded upon the Camillo court's analysis. In Tatom v. Ameritech Corp., No. 99 C 683 (N.D. Ill. September 28, 2000) (mem. op.), the plaintiff retired from working for the defendant and then went to work for one of the defendant's competitors. Tatom, slip op. at ___. One of the benefits that the plaintiff had received while working for the defendant was an incentive plan that provided him with stock options that vested over a period of time. Tatom, slip op. at ___. The incentive plan also noted that if the plaintiff went to work for one of the defendant's competitors, then his rights to any kind

of payments under the plan would be immediately cancelled. Tatom, slip op. at ___. After the defendant refused to pay him pursuant to the incentive plan, the plaintiff filed suit. Tatom, slip op. at ___. The plaintiff argued that the defendant violated the Wage Act when it cancelled his stock options under the incentive plan and did not provide him a bonus under the compensation program. Tatom, slip op. at ___. The district court found that the plaintiff did not have a contractual right to either the stock options or any part of the bonus under the compensation program. Tatom, slip op. at ___. In so ruling, the district court distinguished Camillo, explaining that the compensation program at issue did not unequivocally state that an employee would be paid a bonus each year. Tatom, slip op. at ___.

In In re Comdisco, No. 02 C 7030 (N.D. Ill. February 27, 2003), at issue was whether the employer had wrongfully refused to pay its employees a bonus pursuant to the employer's incentive plan. Comdisco, slip op. at ___. The incentive plan provided that the employees would receive a bonus if they were employed with the company as of February 15, 2002. Comdisco, slip op. at ___. The employees' employment was terminated on December 20, 2001. In determining whether the employees were entitled to pro rata shares of the bonus pursuant to the Wage Act, the district court looked to the terms of the incentive plan. Comdisco, slip op. at ___. The incentive plan provided that employees whose employment terminated for any reason prior to the payment date were not eligible to participate in or receive payments under the plan. Comdisco, slip op. at ___. The incentive plan further provided that no employee would have any vested interest in the incentive plan prior to any payment by the employer. Comdisco, slip op. at ___. Because the incentive plan contained no language guaranteeing that the employees would receive the bonus, the district court concluded that the employees were not entitled to pro rata shares of the bonus. Comdisco, slip op. at ___. In so

ruling, the district court distinguished Camillo, explaining that in Camillo there was an unequivocal promise that the bonus would be paid. Comdisco, slip op. at ___ .

In Arrez v. Kelly Services, Inc., 522 F. Supp. 2d 997, 999 (N.D. Ill. 2007), pursuant to the Wage Act, the plaintiffs brought suit against the defendant, a temporary services agency. The plaintiffs sought payment of their earned vacation pay. Arrez, 522 F. Supp. 2d at 999. The vacation benefit program required the plaintiffs to work at least 1500 hours a year and be employed at the end of the year. Arrez, 522 F. Supp. 2d at 1000. The district court found that the benefit program was a length-of-service plan. Arrez, 522 F. Supp. 2d at 1002. The court explained that because the plain terms and structure of the plan provided a vacation pay benefit as compensation for services rendered, the plaintiffs were entitled to pro rata shares of their vacation pay. Arrez, 522 F. Supp. 2d at 1004-05.

In sum, in determining whether an employee is entitled to a pro rata share of a bonus, the federal court has drawn a distinction between whether or not the employee was unequivocally promised a bonus by his or her employer. If no such unequivocal promise was made, then the employee is not entitled to any part of the bonus pursuant to section 2 of the Wage Act.

We believe that the distinction is appropriate, as it is consistent with the Illinois Department of Labor regulations construing the Wage Act. Such regulations are given substantial weight and deference, as courts appreciate that agencies can make informed judgments upon issues that are related to their areas of experience and expertise. See Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n, 95 Ill. 2d 142, 152-53 (1983). Specifically, section 300.500 of title 56 of the Illinois Administrative Code interprets as follows the meaning of "earned bonus" as that term is used in the Wage Act:

"a) A claim for an earned bonus arises when an employee performs the requirements for a bonus set forth in a contract or an agreement between the parties.

b) A former employee shall be entitled to a proportionate share of a bonus earned by length of service, regardless of any provision in the contract or agreement conditioning payment of the bonus upon employment on a particular date, when the employment relationship was terminated by mutual consent of the parties or by an act of the employer through no fault of the former employee." 56 Ill. Adm. Code §300.500, added at 16 Ill. Reg. 13837, eff. September 1, 1992.

Section 300.500(a) indicates that the right to a bonus must be unequivocal as the employee does not have a right to it until he or she has performed the requirements set forth in a contract. Section 300.500(b) refers to a length-of-service bonus, which is a type of unequivocal bonus to which an employee has a right unless his or her employment is terminated due to his or her own fault. Cf. Dabertin v. HCR Manor Care, Inc., 177 F. Supp. 2d 829, 858 (N.D. Ill. 2001) (employee who voluntarily left company did not meet condition essential to bonus eligibility, i.e., that she be employed with employer on date of payout).

Turning to the facts herein, the language in the parties' contract was not an unequivocal guarantee that the plaintiff would receive the bonus as compensation. Rather, the bonus was clearly conditional, dependent on whether sales for the defendant increased over the previous year. As the bonus referred to in the agreement was not guaranteed to be paid, the plaintiff was not entitled to a pro rata share of that bonus.

We further note that this determination is supported by the plain language of section 5 of the Wage Act. That section provides:

"Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee."  820 ILCS 115/5 (West 2006).

Based on the facts herein, in order to comply with section 5 of the Wage Act, the defendant was required to pay the plaintiff his final compensation by the end of October 2006.  However, if we were to accept the plaintiff's argument that he was entitled to a pro rata share of the bonus based on 2006 sales, that amount could not possibly be known prior to January 1, 2007.  Thus, the mandatory payment date in section 5 would be rendered meaningless.  We will not interpret the statute in such a manner.  See Madison Two Associates v. Pappas, 227 Ill. 2d 474, 493 (2008) (Illinois courts must construe statutes so that no part is rendered a nullity).

We next consider the plaintiff's argument that the phrase "substantial cause" in the parties' contract is ambiguous and therefore precluded summary judgment in the defendant's favor.  The plaintiff notes that the contract provided that the plaintiff's severance pay would differ depending on whether his termination was for substantial cause.  The plaintiff therefore contends that the contract raises the question of what constitutes substantial cause.  The plaintiff insists that because what constitutes substantial cause cannot be determined from the four corners of the contract, the contract is ambiguous and requires extrinsic evidence in order to determine the intent of the parties when the agreement was written.

In response to this argument, the defendant contends that the plaintiff has waived this issue because it is contrary to the argument that he raised before the trial court.  Specifically, the defendant points out that in the proceedings below, the plaintiff argued that the contract language at issue was

not ambiguous and that the trial court could conclude as a matter of law that the stated reasons for his termination did not rise to the level of substantial cause.

The defendant is correct that the plaintiff has waived this argument for our review. See Kravis v. Smith Marine, Inc., 60 Ill. 2d 141, 147 (1975) (theory upon which a case is tried in the lower court cannot be changed on review); see also Killion v. Meeks, 333 Ill. App. 3d 1188, 1190 (2002) (arguments not raised in the trial court are waived on appeal). Even absent waiver, however, the plaintiff's argument is without merit. That is because the plaintiff is seeking to create an ambiguity in the contract where there is none. The contract language at issue provides that the defendant "will guarantee [the plaintiff's] base salary for (6) months for early termination by the company, unless the company has determined your termination is for substantial cause." The plain language of the contract therefore provides the defendant with the discretion to determine whether the plaintiff's termination was for substantial cause.

The real issue thus is not whether the term "substantial cause" is ambiguous but whether the defendant reasonably exercised its contractual discretion in determining that the termination of the plaintiff's employment was for "substantial cause." See Franz v. Calaco Development Corp., 352 Ill. App. 3d 1129, 1152 (2004) (good faith between contracting parties requires that a party vested with contractual discretion must exercise his or her discretion reasonably and may not do so arbitrarily or capriciously). Here, the undisputed facts reveal that the plaintiff's employment was terminated for (1) failure to improve his interpersonal relationships as he was directed in a performance review and (2) failure to comply with a direct order from his superior. Based on these facts, and because there is nothing in the record to suggest that the defendant acted in bad faith in determining that the

termination of the plaintiff's employment was for substantial cause, we reject the plaintiff's argument that the trial court erred in granting the defendant's motion for summary judgment as to this issue.

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

ZENOFF, P.J., and HUDSON, J., concur.

———