In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-1850

LAWRENCE J. HESS and VICKIE C. WARREN,

*Plaintiffs-Appellants,*

*v.*

KANOSKI & ASSOCIATES, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 09-3334—**Michael P. McCuskey**, *Chief Judge.*

ARGUED SEPTEMBER 28, 2011—DECIDED FEBRUARY 2, 2012

Before BAUER, WOOD, and TINDER, *Circuit Judges.*

WOOD, *Circuit Judge.* This case involves a spat over attorneys' fees—in particular, the fees that the firm of Kanoski & Associates allegedly owes to its former associate, Lawrence Hess. After some five years at the firm, Hess was abruptly dismissed. Afterwards, the firm settled several of the cases on which Hess had been working and refused to pay Hess bonuses or fees based on those settlements. Hess believes that he is entitled to

some of that money. He first tried to obtain the payments by filing attorney's liens in Illinois state courts. When that strategy failed, he filed this action in federal court against the firm, its president Ronald Kanoski, and Kennith Blan, Jr., a lawyer loosely associated with the firm who took over Hess's cases.

The district court granted the defendants' motion for summary judgment. It held that the Illinois courts had already determined that the firm did not owe Hess any payments based on cases that had settled after he was fired. As we explain below, this was error. No court—neither the Illinois state courts nor the district court below—has ever decided whether Hess's employment agreement entitles him to compensation for work he did on those cases. Hess makes a plausible case that the agreement entitles him to at least some portion of these revenues. He notes that his contract required the firm to give him 30 days' notice before terminating his employment, but it failed to do so. At the very least, in his view, he is entitled to a share in the settlements reached during that period. We agree with Hess that summary judgment was inappropriate for his contract theories, which he raises in Count I under the Illinois Wage Payment and Collection Act (IWPCA) and in Count IV under general contract law. The remainder of Hess's complaint, however, was correctly dismissed. Accordingly, we affirm in all other respects.

# I

Kanoski & Associates bills itself as the "largest personal injury law firm in central Illinois." Kanoski & Associates,

http://www.kanoski.com/ (last visited Jan. 30, 2012). The firm hired Hess on May 9, 2001, to work primarily on medical malpractice cases. His employment was governed by an agreement that set out his salary and bonus pay. At first Hess apparently performed well for the firm and obtained several favorable settlements. But by 2007, things had gone south; on February 14 of that year, Ronald Kanoski (the firm's president, as we mentioned earlier) fired Hess. In the wake of that action, the firm transferred several of Hess's cases to Kennith Blan, Jr., a lawyer working as an independent contractor for the firm. Over the course of the next year and a half, the firm—largely through Blan's efforts—settled many of these cases. For example, in June 2008, one case settled for $1.25 million.

Hess believed that Blan and the firm had pushed him out in order to settle his cases without sharing with him the generous compensation that accompanied the settlements. In May 2008 Hess began pursuing the fees to which he thought he was entitled. In a letter, he demanded payment from the firm for $316,616.21 in unpaid bonuses. He also filed attorney's liens in Illinois state court in two of the cases the firm had settled without him. Neither claim was successful, for the simple reason that Hess no longer had an attorney-client relationship with the clients.

Hess then turned to federal court, which had jurisdiction under 28 U.S.C. § 1332 because both plaintiffs are citizens of Missouri and all defendants are citizens of Illinois; the amount in controversy easily exceeded

$75,000. His complaint raised a slew of state-law allegations against the firm. It contains eleven counts in all, including such claims as consumer fraud, conspiracy, and "intentional/negligent" spoliation of evidence. His wife, Vickie Warren, raised her own claim for loss of consortium.

At its essence, this case boils down to a single question of contract interpretation: Was Hess entitled under his employment agreement to compensation arising out of any of the post-termination settlements? The district court did not decide this question. Instead, it granted summary judgment to the defendants on the ground that the state court litigation had already resolved this issue in the firm's favor and thus Hess was collaterally estopped from litigating it anew.

We review the district court's grant of summary judgment *de novo*, drawing all reasonable inferences in the light most favorable to Hess, the nonmoving party. *Egan v. Freedom Bank*, 659 F.3d 639, 642 (7th Cir. 2011). Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id*. As we explain, summary judgment was appropriate for most, but not all, of Hess's claims.

## II

### A

We begin with the two counts in Hess's complaint that rest most directly on his employment agreement:

Count I, the claim under the IWPCA; and Count IV, the claim for breach of contract. Stating that Hess "had no right to bonus money for any recoveries which occurred after his termination," the district court granted summary judgment for the firm. It gave two reasons for that conclusion: first, it believed that Hess had admitted in his deposition that he was paid all that he was due; and second, it understood that the state lien decisions had already determined that Hess had no right to post-termination payment and therefore that Hess was precluded from reopening the point. Neither rationale, however, stands up to scrutiny.

The district court's reading of Hess's deposition testimony failed to construe all facts and reasonable inferences in Hess's favor, as it should have done at this stage of the litigation. *Cedar Farm, Harrison Cnty., Inc. v. Louisville Gas & Elec. Co.*, 658 F.3d 807, 810 (7th Cir. 2011). The court focused on Hess's admission that when he left the firm the bonuses he already had been paid were in the correct amounts. Later during the deposition, Hess clarified this response. He emphasized that he had not received *all* of the bonuses he believed he was owed because some settlements occurred after he was fired. As he put it, "there's a handful [of cases] out there that, as an example, went to Mr. Blan. I didn't get bonuses on those." It was error for the district court to construe Hess's statement that he had received some bonuses in the correct amounts as a broader admission that he had no claim to any other bonus. Nowhere in his deposition does Hess admit that the firm paid him the latter bonuses.

Nor does any state court decision preclude Hess from raising the issue of his post-termination bonuses. In the state lien matters the courts rejected Hess's claims because Hess no longer had an attorney-client relationship with the clients. See *Thompson v. Skeffington, et al.*, 4-09-076 (Ill. App. Ct. May 26, 2010) ("Hess did not have an attorney-client relationship with Thompson when he served his notice of an attorney's lien. On that basis alone, the trial court's striking Hess's invalid attorney's lien was proper."); *Lloyd v. Billiter, et al.*, 5-09-0065 (Ill. App. Ct. Oct. 15, 2010) ("Any attorney-client relationship between Hess and plaintiffs had long ceased.").

The district court focused on one sentence in *Lloyd*—that Hess's "employment contract would bar any claim he has for further compensation for his work on the *Lloyd* litigation"—and thought that this settled the matter. But the state court's decision must be read in context. The state court was not evaluating Hess's rights against the firm; it was looking at whether Hess could assert a right against the clients to be paid. The state court concluded that he could not pursue the clients both because he was no longer in an attorney-client relationship with the clients and because his contract gave him "no proprietary right or interest in representation of [the firm's clients]." The court never considered whether Hess had a claim for payment against his former employer. Since the issues were different, nothing in the state court decisions serves as a basis for issue preclusion. See, *e.g., Wakehouse v. Goodyear Tire & Rubber Co.*, 818 N.E.2d 1269, 1275 (Ill. App. Ct. 2004).

This brings us to the merits of Hess's claims. To succeed on his breach of contract claim, Hess must show "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Henderson-Smith & Assoc., Inc. v. Nahamani Family Serv. Ctr., Inc.*, 752 N.E.2d 33, 43 (Ill. App. Ct. 2001). To prevail on his IWPCA claim, Hess must first show that he had a valid contract or employment agreement. Illinois courts have explained that an agreement under the IWPCA is "broader than a contract*." Zabinsky v. Gelber Group, Inc.*, 807 N.E.2d 666, 671 (Ill. App. Ct. 2004) (the IWPCA "requires only a manifestation of mutual assent on the part of two or more persons; parties may enter into an 'agreement' without the formalities and accompanying legal protections of a contract"). The IWPCA requires an employer to pay an employee any final compensation due under that contract or agreement at the time of separation; it defines final compensation to include "wages, salaries, earned commissions, earned bonuses, . . . and any other compensation owed by the employer pursuant to an employment contract or agreement between the two parties." 820 ILCS 115/2 (2006).

The parties do not dispute that Hess had a valid contract with the firm (his "employment agreement," not to be confused with "agreement" as it is used by the IWPCA) and that, until his termination, he adequately performed as an employee under that contract. The dispute is solely over whether Hess's employment agreement entitled him to bonuses on settlements that were

collected after he left the firm. The employment agreement originally provided that Hess would receive "15% of all fees generated over the base salary (or $5,000 per month) with a guarantee of One Hundred and Twenty Five Thousand ($125,000). Bonus shall increase to 25% of all fees received annually in excess of $750,000.00." The firm later modified Hess's compensation on June 21, 2002, increasing his base salary and changing the bonus structure to "40% of all fee revenue generated" (with some exceptions). (While the district court was apparently unsure whether the agreement included the terms found in a June 21 letter from the firm to Hess that Hess had never signed, we see no reason not to include that material. The critical signature is that of the party against whom the contract is being enforced, and that signature was present.)

No court has ever resolved the question whether this contract requires the firm to pay Hess bonuses from post-termination settlements. The language of the contract is not clear because the contract does not define when fees are "generated." Fees might be "generated" when work is performed on a case, because the work ultimately leads to the settlement. This does not seem odd if one considers the scenario in which an attorney works on a case until it is nearly ready for settlement, is fired, and then the next day the firm accepts a settlement without her. If, on the other hand, fees are "generated" only when received by the firm, Hess would not be entitled to the post-termination settlement earnings.

Under Illinois law, undefined terms are generally given their "plain, ordinary, and popular meaning" as

found in dictionary definitions. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1215 (Ill. 1993); see also *Frederick v. Prof'l Truck Driver Training Sch., Inc.*, 765 N.E.2d 1143, 1152 (Ill. App. Ct. 2002). Resort to dictionary definitions often, however, does not settle the question; that is the case here. The infinitive "to generate" means (among other things) "to bring into existence" or "to be the cause of." MERRIAM-WEBSTER DICTIONARY ONLINE, http://www.merriam-webster.com/dictionary/ generated (last visited Jan. 30, 2012); see also OXFORD ENGLISH DICTIONARY ONLINE, http://www.oed.com/ viewdictionaryentry/Entry/77518 (defining "generated" as "[p]roduced, created; caused") (last visited Jan. 30, 2012). Work performed before a settlement is obtained in some sense produces or brings that settlement into existence. On the other hand, it is possible that the parties intended "generated" to be limited to the final act of bringing a fee into existence, *i.e.*, actually obtaining the cash in hand. Where language in a contract appears to be "susceptible to more than one meaning," Illinois courts will "consider extrinsic evidence to determine the parties' intent." *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011).

Even if the district court concludes that Hess's interpretation is too broad and thus the contract does not entitle Hess to bonuses on *all* of the post-termination settlements, Hess has a good argument that he is entitled at least to the fees related to settlements obtained within the 30-day period after he was fired. The contract required the firm to give Hess 30 days' notice before it ended his employment, but it did not do so. A

30-day provision is consistent with an at-will contract, *H. Vincent Allen & Associates, Inc. v. Weis*, 379 N.E.2d 765, 771-72 (Ill. App. Ct. 1978), but breach of the 30-day provision requires the firm to pay Hess whatever compensation he was due during that time. See, *e.g.*, *Equity Ins. Managers of Ill., LLC v. McNichols*, 755 N.E.2d 75, 81 (Ill. App. Ct. 2001). At least one of the settlements Hess has identified—the Hoelscher settlement—was obtained within that 30-day period. He is entitled to press his argument that the contract gave him the right to bonuses in connection with that settlement, no matter what the parties meant by the term "generated."

Contract interpretation is something on which we conduct independent review, *Holmes v. Potter*, 552 F.3d 536, 538 (7th Cir. 2008), but "[w]here, as here, there is more than one reasonable way to read the parties' contract, it is not our role to choose among the competing reasonable interpretations." *Curia v. Nelson*, 587 F.3d 824, 832 (7th Cir. 2009). Especially in light of the fact that the parties have not fully briefed this question before our court, we remand for the district court to interpret the contract and consider the merits of Hess's theories under Counts I and IV.

B

Hess has also asserted that the defendants induced a breach of contract (Count V) and tortiously interfered with his contracts (Count VI). These two counts are functionally the same: Illinois courts address allegations that parties have improperly induced breach under the

tortious-interference framework. See, *e.g.*, *Complete Conference Coordinators, Inc. v. Kumon N. Am.*, 915 N.E.2d 88 (Ill. App. Ct. 2009); *Cress v. Recreation Serv., Inc.*, 795 N.E.2d 817, 844 (Ill. App. Ct. 2003).

To prove tortious interference, Hess must show "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of the contract; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's conduct; and (5) damages." *Complete Conference Coordinators, Inc.*, 915 N.E.2d at 93. We agree with the district court that Hess cannot meet these elements with respect to any defendant. As to the claim against the firm and Kanoski in his capacity as firm president, Hess founders because his contract with the firm is not with "another." In Illinois, "[i]t is well established that a party cannot tortiously interfere with a contract to which he is a party." *Fiumetto v. Garrett Enter., Inc.*, 749 N.E.2d 992, 1004 (Ill. App. Ct. 2001).

This leaves only Hess's tortious interference claim against Blan. Hess had to point to some evidence in the record that could support a finding that Blan's intentional conduct caused the firm to breach Hess's employment contract. The only evidence Hess offered was an allegation that Blan disparaged Hess's work to a client, but he had no proof that anyone at the firm heard this comment. Without any evidence that Blan's conduct caused the firm to breach its contract with Hess, summary judgment for Blan was appropriate.

Hess also alleged that the defendants interfered with a variety of other rights, such as his attorney's liens and alleged contractual arrangements he had with his former clients. The district court correctly dismissed all of these claims because the only contract to which Hess was a party was his employment contract, and under that contract, Hess had no right to an ongoing relationship with the firm's clients. We therefore affirm the grant of summary judgment on Counts V and VI of the complaint.

C

The remainder of Hess's complaint is a ragtag of poorly pleaded claims, and like the district court, we can quickly dispose of them. A few of Hess's claims lack any support in Illinois law. Hess has no claim under the Illinois Consumer Fraud Act, Count II, because Hess was an employee, not a "consumer." 815 ILCS 505/1(e). His claim for wrongful discharge, Count III, fails because Hess was an at-will employee and an at-will employee cannot sue for wrongful discharge. *Hartlein v. Ill. Power Co.*, 601 N.E.2d 720, 728 (Ill. 1992). Even though at-will employees in Illinois can sometimes sue for retaliatory discharge, *id.*, this does not apply to attorneys like Hess. *Jacobson v. Knepper & Moga, P.C.*, 706 N.E.2d 491, 494 (Ill. 1998). Hess's claim in Count IX for breach of fiduciary duty is doomed because Hess's relationship with the firm was that of employer/employee, and in Illinois, this relationship does not give rise to a fiduciary duty. *Hytel Group, Inc. v. Butler*, 938 N.E.2d 542, 548 (Ill. App. Ct. 2010).

Partners in a law firm may owe one another a fiduciary duty because of their profit-sharing arrangements, *Dowd v. Dowd, Ltd. v. Gleason*, 693 N.E.2d 358 (Ill. 1998), but that doctrine does not help Hess because he was an employee, not a partner.

Hess's claims for unjust enrichment and quantum meruit in Count VII are also unsupported by Illinois law. Unjust enrichment is an equitable remedy that lies where a "defendant has unjustly retained a benefit to the plaintiff's detriment and . . . the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *A.P. Properties, Inc. v. Rattner*, ___ N.E.2d ___, 2011 WL 5321174, *3 (Ill. App. Ct. 2011). Quantum meruit is a quasi-contract doctrine that allows courts to imply the existence of a contract to prevent injustice. *Hayes Mech., Inc. v. First Indus., L.P.*, 812 N.E.2d 419, 426 (Ill. 2004). A plaintiff cannot pursue either action, however, if his relationship with a defendant is—like Hess's with the firm—governed by an express contract. See *Stathis v. Geldermann, Inc.*, 692 N.E.2d 798, 812 (Ill. App. Ct. 1998) (unjust enrichment); *Keck Garrett & Assoc., Inc. v. Nextel Commc'ns, Inc.*, 517 F.3d 476, 487 (7th Cir. 2008) (quantum meruit).

All that is left of Count VII are Hess's claims for quantum meruit and unjust enrichment against Blan and Kanoski in his individual capacity, but they too lack merit. A plaintiff cannot recover under quantum meruit if he has no expectation that the defendant would be the one to pay for the services. *Paradise v. Augustana Hosp. & Health Care Ctr.*, 584 N.E.2d 326, 329 (Ill. App. Ct. 1991). Any

payment Hess expected to receive would have been from the firm, not Blan or Kanoski individually. Nor can Hess show that either Blan or Kanoski were unjustly enriched. If Blan worked on the cases and was entitled to receive bonuses under his own contract, then he should have received those bonuses; Blan's bonus was not received to Hess's detriment. And Hess makes no allegation that Kanoski retained Hess's bonus in his individual capacity. It is the firm that would have wrongfully retained Hess's bonus payments (assuming Hess succeeds on his contract and wage claims), not Kanoski individually.

The district court properly disposed of the remaining counts because they lacked adequate development or support. This court has repeatedly explained that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006). Hess has made no argument on appeal to support his claim in Count VIII for spoliation of evidence and thus has waived this claim. As to his claim in Count VIII for conversion, on appeal Hess focuses only on a dispute over vacation pay, but Hess admitted in his deposition that the parties had "worked . . . out" the vacation pay issue.

Hess's civil conspiracy claim in Count XI fares no better. Hess's pleadings are bare of any factual allegations that support this claim. The complaint stated, without elaboration, that the "defendants combined with each other to commit unlawful acts mentioned

above or to cover up the unlawful acts mentioned above." This is not enough. See *Seng-Tiong Ho v. Taflove*, 648 F.3d 489, 502 (7th Cir. 2011). The only facts Hess has pointed to in this case with respect to Blan's involvement—the disparaging remarks previously discussed—are insufficient to support a finding of causation, which is one of the elements of civil conspiracy. See *Clarage v. Kuzma*, 795 N.E.2d 348, 358-59 (Ill. App. Ct. 2003).

Finally, we turn to Warren's complaint for loss of consortium, raised in Count X. This claim is "necessarily predicated on the claim of a directly injured spouse." *Monroe v. Trinity Hosp.-Advocate*, 803 N.E.2d 1002, 1005 (Ill. App. Ct. 2003). Because Hess no longer has any live tort claims against defendants, his wife's claim was correctly dismissed.

* * * *

We REVERSE the district court's grant of summary judgment on Counts I and IV and AFFIRM on all other counts. The case is REMANDED for further proceedings consistent with this opinion. Each side is to bear its own costs.