In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 14-1921

LAWRENCE J. HESS,

*Plaintiff-Appellant,*

*v.*

KANOSKI BRESNEY,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:09-cv-03334 — **Sara Darrow**, *Judge.*

---

ARGUED DECEMBER 5, 2014 — DECIDED MAY 4, 2015

---

Before FLAUM, EASTERBROOK, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* This breach of contract action is before this court—pursuant to our diversity jurisdiction—a second time. As a refresher, Lawrence J. Hess, an attorney, had worked on a number of medical-malpractice cases before his law firm, Kanoski & Associates, P.C. ("K&A"),[1] ter-

---

[1] Per Appellee's Rule 26.1 Disclosure Statement of December 5, 2014, Kanoski & Associates is now Kanoski Bresney. As it is the real party in in-

minated his employment. Many of these cases settled after Hess's termination, and Hess did not see a penny from the settlements. Hess felt cheated.

So he sued under his employment agreement and under the Illinois Wage Payment and Collection Act ("IWPCA") to remedy the perceived wrong. He also advanced claims of tortious interference, wrongful discharge, unjust enrichment, and quantum meruit, among others. In 2011, the district court dismissed each of Hess's claims on summary judgment. *Hess v. Kanoski & Assocs.*, No. 09-3334, 2011 U.S. Dist. LEXIS 25672, at *35 (C.D. Ill. Mar. 11, 2011) ("*Hess I*"). The following year, we affirmed in part and reversed in part. *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 456 (7th Cir. 2012) (remanding IWPCA and breach of contract claims) ("*Hess II*"). We remanded because the issue that is now squarely before us—whether Hess is entitled to compensation for post-termination settlements under either his employment agreement or the IWPCA—was "not fully briefed" at that stage of the case. *Id.* at 454.

On remand, and with the benefit of additional briefing, the district court held that Hess was not entitled to compensation for the post-termination settlements. As a result, the district court once again granted summary judgment in favor of K&A. *Hess v. Kanoski & Assocs.*, No. 3:09-cv-03334, 2014 U.S. Dist. LEXIS 42584, at *25 (C.D. Ill. Mar. 28, 2014) ("*Hess III*"). Hess appealed, and on December 5, 2014, argued his case on his own behalf.

---

terest to this lawsuit, we have changed the caption to reflect that fact. For the sake of consistency, however, we refer to the firm as Kanoski & Associates or K&A.

After carefully considering the parties' oral arguments and briefing, we affirm the judgment of the district court.

## I. BACKGROUND

Lawrence J. Hess is an attorney who is licensed to practice law in Illinois and Missouri. K&A is a personal-injury law firm with offices in central Illinois. On May 9, 2001, K&A hired Hess to handle medical-malpractice cases—Hess's specialty. And for nearly six years, Hess did just that. He even won a significant jury verdict, which triggered a healthy, renegotiated salary. Then the bottom fell out. On February 14, 2007, the firm terminated Hess. Ronald Kanoski, K&A's president and administrator during Hess's employment, testified that he based this decision on "economic reasons."

If you ask Hess, the "economic reasons" included the firm's desire to reap a disproportionate share of the fees earned from the 170 breast-implant cases that Hess had worked on prior to his termination. These breast-implant cases stemmed from a nationwide settlement with Dow-Corning for its silicone-based breast implants. The number of cases, coupled with the estimated cost of remedies, induced Dow Corning into bankruptcy. *Cf.* Editorial, *Seeking Shelter from a Legal Storm*, Chicago Tribune, May 22, 1995, at 1:10. Hess also seeks to recover fees from five non-breast-implant cases on which he had worked before his termination.

Hess theorizes that K&A terminated him to avoid paying him the fees due on those cases. He asserts that he "successfully completed all the work necessary for the firm to be paid fees" on these matters. "Nothing remained to be done,"

Hess maintains, "except to wait for the receipt of the checks."

As an initial matter, the record lends some support to Hess's theory of motive. K&A abruptly terminated Hess without any notice, which suggests it was in a rush to get rid of him. K&A concedes that this swift termination breached the thirty-day-notice provision of their employment agreement. But that breach is of no moment to this appeal. For even if the breach gave rise to some sort of equitable, constructive employment lasting thirty days after his actual date of termination, that constructive employment would not have captured any of the settlements or their resultant bonuses; the subject cases settled outside the thirty-day window.[2] As a result, Hess still would have been out of luck.

But Hess offers a backstop. Because K&A breached the notice provision of his employment agreement, he was never actually terminated—or so the theory goes. Under this theory, all the income that K&A received for his cases was received while he was still an employee at the firm. So he should have been paid the fees. K&A quickly responds with waiver. K&A contends that Hess waived this argument because he did not raise it before the district court. We address these arguments below.

---

[2] In *Hess II*, we noted that at least one case settled within the thirty-day window. 668 F.3d at 453. We then held that Hess "is entitled to press his argument that the contract gave him the right to bonuses in connection with that settlement … ." *Id.* On remand, however, Hess conceded that all cases had, in fact, settled *outside* the thirty-day window. He therefore abandoned this path to recovery. We'll return to this point later. For now, we add only that it is undisputed that K&A paid bonuses to Hess for all cases that were resolved during his employment at the firm.

Before we do, our focus turns to two provisions of the employment agreement. These provisions—one found in the original employment agreement and one found in a subsequent modification letter—are ultimately dispositive. They address matters related to compensation, and we introduce them now.

Section 4 of the employment agreement is titled "Compensation." It states that Hess will receive bonus pay in the amount of fifteen percent of all fees "*generated* over the base salary (or $5,000 per month) … ." It further states that the "[b]onus shall increase" to twenty-five percent "on all fees *received* annually in excess of $750,000.00." We emphasize the words "generated" and "received" because the parties spend much of their time debating their meaning.

According to K&A, the words "generated" and "received" are used interchangeably. Under this view, they are synonymous. "Years of work can go into a case," K&A contends, "and yet, there is no fee generated unless or until there is a recovery for the client … ." Hess disagrees. He argues that one can *generate*—i.e. create—something without ever *receiving* it. Under that common-usage view, the terms are not synonymous, and Hess would be entitled to bonuses or fees for his work that *generated* the fees, regardless of when the firm *received* them.

In *Hess II*, we flagged this issue for remand. 668 F.3d at 453. Noting the utility of extrinsic evidence in determining the meaning of the term "generate," we offered Hess a second path to recovery: production of extrinsic evidence to prove his definition is the correct one. Hess supplied no extrinsic evidence. To be sure, he submitted his deposition testimony that detailed his performance at the firm. But that

deposition testimony provided no extrinsic evidence on the meaning of the term "generate." No evidence did, in fact. In failing to supply extrinsic evidence on this key point, Hess abandoned a second path to recovery offered by our mandate.

Left with no extrinsic evidence, and understanding that no cases settled thirty days after his termination, the district court resorted to the parties' briefs and the terms of the contract. It sided with K&A. Those terms, coupled with the contingency-fee nature of the cases at K&A, informed its analysis:

> [Hess's] interpretation of "generated" ignores fundamental principles underlying these arrangements. An attorney is not contractually entitled to a fee unless and until her client wins, and, therefore, always bears the risk of loss. … When Hess was terminated by K&A, there was no guarantee that any of his efforts would result in contingency fees accruing in the cases at issue. Therefore, the fees could not yet have been generated.

*Hess III*, 2014 U.S. Dist. LEXIS 42584, at *13-14. Impliedly, then, the district court read the terms "generate" and "received" synonymously, which it believed "accords with the basic structure of contingency fee arrangements … ." *Id.* at *14. Different meanings of the terms would have resulted in two "messy" bonus schemes, it held, depending on how much money the firm received in a given year. *Id.* The district court further observed that Hess offered no evidence that the parties intended different meanings of the relevant terms. *Id.* at *14-15. And Hess conceded as much at oral argument on appeal.

Hess nevertheless takes issue with the district court's analysis. He points to the modification letter of June 21, 2002, wherein Ronald Kanoski confirmed to Hess the result of their "recent salary and bonus negotiations … ." Although Hess did not sign this letter, he treats it as a binding amendment to the employment agreement. Given that the terms of the letter governed his compensation from 2002 until 2007, we accept Hess's treatment. *Cf. Hess II*, 668 F.3d at 452–53 ("The critical signature is that of the party against whom the contract is being enforced, and that signature was present.").

"[E]ffectively immediately," Kanoski wrote, "you will be eligible to receive as a bonus" forty percent "of all fee revenue *generated* … ." (emphasis added). Hess places significant weight on the fact that this modification foregoes usage of the term "received." Because the modification does not use that word, it follows that a fee need not be "received" before a "generated" bonus "can be allotted to the employee," or so his argument goes. We discuss both the original provision and its modification in our analysis section below.

Before we do, a third provision is worth mentioning. Section 8 of the employment agreement, entitled "Covenant Limiting Competition," addresses competition and client relationships. It provides that, "where the Corporation retains clients upon Employees [*sic*] termination that Employee has *no proprietary interest in fees to be earned* since the Employee is to be fully compensated through his salary and/or bonus for all work done while an Employee of the Corporation" (emphasis added).

Both parties claim that this provision supports their arguments; they just emphasize different parts of the provi-

sion. K&A, for example, emphasizes "no propriety interest in fees to be earned." It claims that this language imposes a categorical ban to post-termination compensation. Hess, by contrast, emphasizes "the Employee is to be fully compensated through his salary and/or bonus for all work done while an Employee." Because he maintains that all the work for the breast-implant cases was complete before his termination, he claims that this language entitles him to the fees.

## II. ANALYSIS

We review a district court's grant of summary judgment *de novo*. *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014). Summary judgment is appropriate where the admissible evidence reveals no genuine issue of any material fact. Fed. R. Civ. P. 56(c); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001). A fact is "material" if it is one identified by the law as affecting the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). We construe all facts and reasonable inferences in the light most favorable to the non-moving party. *Apex Digital, Inc. v. Sears, Roebuck, & Co.*, 735 F.3d 962, 965 (7th Cir. 2013).

In diversity cases, we apply federal procedural law and state substantive law. *Allen v. Cedar Real Estate Grp., LLP*, 236 F.3d 374, 380 (7th Cir. 2001) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)). Rules of contract interpretation are substantive. *Allen*, 236 F.3d at 380. So our interpretation of this contract—the employment agreement—must be according to state law. The parties agree that the applicable

state law is the law of Illinois. We examine Hess's breach of contract claim first.

*A. Breach of Contract Claim*

Under Illinois law, a breach of contract claim has four elements: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Hess II*, 668 F.3d at 452 (quoting *Henderson-Smith & Assocs. v. Nahamani Family Serv. Ctr.*, 752 N.E.2d 33, 43 (Ill. App. Ct. 2001)) (internal quotation marks omitted). Our focus throughout this four-element inquiry "is to give effect to the parties' intentions." *Henderson-Smith & Assocs.*, 752 N.E.2d at 43. In conducting this task, we review the employment agreement and the district court's holding *de novo*. *C.A.M. Affiliates v. First Am. Title Ins. Co.*, 715 N.E.2d 778, 782 (Ill. App. Ct. 1999).

We also hold the plaintiff to his burden: i.e. persuading the court that he should prevail. *See Schaffer v. Weast*, 546 U.S. 49, 57 (2005) ("[P]laintiffs bear the burden of persuasion regarding the essential aspects of their claims."). As noted above, when we first addressed this case, we provided Hess with two paths to recovery on remand: (1) press his argument that he is entitled to recover for the one case that settled within thirty days of his termination; and (2) offer extrinsic evidence on the meaning of the term "generate." *Hess II*, 668 F.3d at 453. Hess did neither.

Instead, Hess conceded to the district court that none of his cases actually settled within thirty days of his termination. So that path—option one—is out. As for the second path, Hess's depositions did not address the meaning of the

term "generate." So option two is out as well. The result: Hess failed to meet his burden. And we cannot rule in his favor.

Hess's arguments to the contrary cannot save this result. Although we might have used different language, we nevertheless find that the parties intended a simple, straightforward plan for bonus compensation. *See FCC v. Airadigm Commc'ns, Inc.*, 616 F.3d 642, 657 (7th Cir. 2010) ("[A] court should provide the most plausible reading of an ambiguous contract where parties do not point to extrinsic evidence at summary judgment."). That plan does not require K&A to pay Hess fees for cases that settled after his date of termination—even if he worked on those cases before his termination. Because we hold that the employment agreement does not require such a payment, Hess cannot prove breach. And because he cannot prove breach, the district court properly granted summary judgment in favor of K&A on this claim.

Our *de novo* inquiry of the contract starts with the term "generate." While we agree with Hess that "generate" has a common-usage definition that is different from the term "received," *compare* Webster's Third New International Dictionary 945 (1986) (defining generate as "to cause to be: bring into existence"), *with id.* at 1894 (defining receive as "to take possession or delivery of: to knowingly accept"), the employment agreement deploys these terms interchangeably. As a result, the most plausible reading is that they are synonymous: fees are not generated until they are received. Some background on this point is helpful.

Section 4, where both terms first appear, presents a two-tier bonus system. This system incentivizes firm profits by triggering larger bonuses for Hess once annual fees cross a

certain threshold. The K&A promise is clear: the more money Hess brings in, the more money Hess takes home. Section 4 states in relevant part:

> Corporation hereby acknowledges that Employee's starting salary shall be $60,000. Corporation further acknowledges that Employee will receive bonus pay as follows: 15% of all fees generated over the base salary (or $5,000 per month) with a guarantee of One Hundred Twenty-Five Thousand ($125,000). Bonus pay shall increase to 25% on all fees received annually in excess of $750,000.00.

Thus, Hess's bonus jumps from fifteen percent to twenty-five percent when annual fees received exceed $750,000.

By reading "generated" synonymously with "received," this formula for bonus compensation is straightforward and easy to apply. It is so easy, in fact, that even a group of lawyers could figure it out. *Cf. Jackson v. Pollion*, 733 F.3d 786, 788 (7th Cir. 2013) ("Innumerable are the lawyers who explain that they picked law over a technical field because they have a 'math block … .'").

But if Hess has his way, giving distinct meaning to each term, this simplicity is abandoned. For example, by insisting on a definition of "generate" that means "to create" rather than "to receive," Hess requires the firm to adopt an approach that measures what he created. This approach is presumably weighted by unknown quantities and qualities of work, proportionate to the associates or partners who are doing the work.

We quickly can think of many factors that would need to be examined before K&A could determine how much of a

given fee Hess helped *to create*: time spent on a matter, type of matter worked on, ultimate work product, research, writing, editing, travel time, correspondence, meetings, and so on. And that is before the firm adjusts the bonus for any work done by another attorney on the same case. It is telling that the employment agreement does not mention any of these guideposts.

As a result, Hess's interpretation of the agreement is not as plausible as K&A's. Given there is no extrinsic evidence to compel a different result, we find in favor of K&A. This interpretation conforms to the "fundamental principles" that underlie contingency-fee arrangements at K&A. *Hess III*, 2013 U.S. Dist. LEXIS 42854, at *14. Hess has no right under the employment agreement to fees received from cases that settled after his termination.

The June 21, 2002, modification letter does not mandate a different result. That modification states, in relevant part:

> Your annual salary will, starting immediately, be adjusted to $100,000. Also effective immediately you will be eligible to receive as a bonus 40% of all fee revenue generated except as follows: a) no bonus will be paid on the first $100,000 of annual fee revenue generated; and, b) if it is otherwise eligible, only a 10% bonus will be paid for fees generated on the Robert Thompson file.

Hess argues that this modification supports his position. Specifically, Hess argues that "generated" and "received" cannot be synonymous because the last-in-time document—the modification—does not deploy them interchangeably. We reject this argument.

To be sure, the modification foregoes usage of the term "received." But it does not follow that Hess's definition of "generate" springs into effect. Section 2 of the original employment agreement has never been modified, and it deploys the term "received" in the same manner as Section 4. Entitled "Establishment of Employment," Section 2 provides in relevant part, "All proceeds *received* by [Hess] for professional services rendered for Corporation clients shall be the property of the Corporation" (emphasis added).

Consistent with the rest of the contract, "generated" could be substituted with the term "received," and the overall meaning of the provision would remain the same. *Henderson v. Roadway Express*, 720 N.E.2d 1108, 1111 (Ill. App. Ct. 1999) (noting that courts should harmonize provisions of a contract to avoid conflict). Hess cannot overcome this fact. In sum, fees are not "generated" at K&A until they are "received."

What is more, although the numbers are different, the bonus formula presented in the modification letter is consistent with the original formula presented in Section 4 of the agreement: cross a certain threshold of fee revenue and receive a certain percentage of bonus compensation. In this case, once the generated fee revenue exceeds $100,000, then the forty-percent bonus is triggered.

If anything, this latter formula is even simpler than the original formula because it consists of only one tier, albeit with a caveat—the Thompson file. It is probative, moreover, that this modification—like the employment agreement—does not explain the complex rubric that would result from adopting Hess's interpretation of the term "generate." In the

end, K&A's interpretation of the contract is the most plausible one. We adopt it today.

Attempting to save his case, Hess argues that the district court acted outside our mandate from *Hess II* by failing to consider extrinsic evidence. But what was the district court supposed to consider? Hess offered no extrinsic evidence on the meaning of the key term—"generate." His depositions did not speak to that issue. Hess cannot attack the district court for failing to consider evidence that he never offered. Consequently, we reject this argument.

Hess finally contends that K&A never effectively terminated him because it breached the thirty-day-notice provision of the employment agreement. As a result, Hess argues, he remained an employee at K&A when the firm received all the income from his remaining cases, which entitles him to compensation. As we noted above, K&A contends that Hess waived this argument by not briefing it before the district court.

We agree with K&A. It is well settled that arguments not developed before the district court are deemed waived on appeal. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2014). And even if it was not waived, Hess still could not prevail under this theory. Taken to its logical conclusion, it would mean that Hess remained an employee of K&A for a period of time lasting well after his termination. Given the time spent away from the firm, and considering his employment elsewhere, under this theory, Hess might find himself defending, rather than advancing, claims against K&A. Surely Hess does not desire this result.

In sum, the district court adopted the most plausible in-terpretation of the contract. Having conducted our own *de novo* review, we agree with that interpretation. Because we find Section 4 and the modification letter to be on point, we need not examine Section 8, addressing competition. We turn, instead, to Hess's remaining claim under the IWPCA.

*B. IWPCA Claim*

The IWPCA is designed "to provide employees with a cause of action for the timely and complete payment of earned wages or final compensation, without retaliation from employers." *Byung Moo Soh v. Target Mktg. Sys., Inc.* 817 N.E.2d 1105, 1107 (Ill. App. Ct. 2004). It states that final compensation "shall be defined as wages, salaries, earned commissions, *earned bonuses* and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract … ." 820 Ill. Comp. Stat. 115/2 (emphasis added).

Because the IWPCA does not define the term "earned bonuses," Illinois courts analogize them to "earned vacation." *See Camillo v. Wal-Mart Stores, Inc.*, 582 N.E.2d 729, 734 (Ill. App. Ct. 1991) ("'[E]arned vacation' and 'earned bonus' should be interpreted similarly... ."). Where there is an unequivocal promise that a bonus will be paid, at least one court has awarded a *pro rata* share of that bonus to the terminated employee. *See Camillo*, 582 N.E.2d at 731–35. Where, by contrast, there is no unequivocal promise that a bonus will be paid, three courts have denied recovery under the IWPCA. *See McLaughlin v. Sternberg Lanterns, Inc.*, 917 N.E.2d 1065, 1071 (Ill. App. Ct. 2009); *In re Comdisco*, Nos. 02 C 7030 & 02 C 7031, 2003 U.S. Dist. LEXIS 2982, at *17 (N.D.

Ill. Feb. 27, 2003); *Tatom v. Ameritech Corp.*, No. 99 C 683, 2000 U.S. Dist. LEXIS 16720, at *26-27(N.D. Ill. Sept. 28, 2000).

These decisions are consistent with regulations promulgated by the Illinois Department of Labor, which define "earned bonuses" under the IWPCA:

> An employee has a right to an earned bonus *when there is an unequivocal promise by the employer* and the employee has performed the requirements set forth in the bonus agreement between the parties *and all of the required conditions for receiving the bonus set forth in the bonus agreement have been met*.

56 Ill. Adm. Code § 300.500 (2014) (emphasis added). Under Illinois law, this regulation is entitled to "substantial weight and deference." *McLaughlin*, 917 N.E.2d at 1071.

Here, Hess's claim under the IWPCA fails for two reasons. First, there is no *unequivocal* promise that a bonus will be paid. On this point, we look to the terms of the modification letter, which, despite not having been signed by Hess, both parties agree governs the terms of Hess's compensation from June 21, 2002, until the date of his termination on February 14, 2007. The modification states that Hess "will be *eligible* to receive as a bonus" a certain percentage of all fee revenue generated over $100,000 (emphasis added).

Eligibility, of course, is no guarantee. Hess might very well be eligible for a bonus, but due to a host of factors, not receive one. As a result, we do not find this bonus provision to be the kind of unequivocal promise that is required under applicable Illinois law. *McLaughlin*, 917 N.E.2d at 1071 ("If no such unequivocal promise was made, then the employee is

not entitled to any part of the bonus pursuant to section 2 of the Wage Act [IWPCA].").  So on this ground alone, Hess's claim under the IWPCA for post-termination settlement fees fails.

But even assuming, for the sake of argument, that the parties intended eligibility to equate to a guarantee, Hess still would not be entitled to recovery under the IWPCA. For as we have already found, the employment agreement only provides for bonuses once a certain amount of fee revenue is *received*. Here, Hess acknowledges that K&A did not receive the settlement fees from his medical-malpractice cases until after his termination. That means not "all of the required conditions for receiving the bonus set forth in the bonus agreement have been met." 56 Ill. Adm. Code § 300.500 (2014). This second reason, then, independently denies relief to Hess under the IWPCA. As there exists no genuine issue of material fact on which to proceed to trial, summary judgment was appropriately granted in favor of K&A on Hess's IWPCA claim.

## III. CONCLUSION

For the foregoing reasons, Hess cannot recover any fees from the post-termination settlements. The judgment of the district court is AFFIRMED.