**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230149-U

Order filed June 6, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| MICHELE McBAIN, | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| Plaintiff-Counter-Defendant-Appellee, | ) | Du Page County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-23-0149 |
| | ) | Circuit No. 19-L-1298 |
| | ) | |
| MARCORP FINANCIAL, LLC, a Delaware | ) | |
| Limited Liability Company; SERVICES | ) | |
| CAPITAL, LLC, an Illinois Limited Liability | ) | |
| Company; and MICHAEL FAZIO, | ) | |
| | ) | Honorable |
| Defendants- | ) | Angelo J. Kappas, |
| Counter-Plaintiffs-Appellants. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Justices Hettel and Peterson concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*: We affirm the jury's verdict on plaintiff's breach-of-contract claim, the jury's denial of defendants' breach-of-fiduciary-duty claim, and the trial court's finding on plaintiff's claim under the Illinois Wage Payment and Collection Act, as well as corresponding damages. Affirmed.

¶ 2     Plaintiff, Michele McBain, filed a complaint against her former employers, defendants

MARCorp Financial, LLC, its subsidiary Services Capital, LLC, and MARCorp's 99% owner,

Michael Fazio (collectively MARCorp), for breach of contract and violation of the Illinois Wage Payment and Collection Act (Wage Act) (820 ILCS 115/1 *et seq*. (West 2018)). The claims were alternative to one another in that they sought the same monetary relief. MARCorp filed affirmative defenses and a counterclaim, alleging, *inter alia*, breach of fiduciary duty. The case proceeded to a simultaneous bench and jury trial, where the plaintiff prevailed on her claims and MARCorp did not prevail on its breach-of-fiduciary-duty affirmative defense and counterclaim. The trial court and the jury each determined that MARCorp owed McBain $242,675 in unpaid, earned bonuses. (Separately, the jury awarded MARCorp a $54,000 verdict on an unrelated breach-of-contract counterclaim (not at issue on appeal)). MARCorp appeals the judgments against it. We affirm.

¶ 3                                            I. BACKGROUND

¶ 4        On November 18, 2019, McBain filed a complaint against MARCorp, alleging a violation of the Wage Act and breach of contract. Both claims turned in large part on the question of whether McBain had earned her 2018 bonus and whether MARCorp was required to pay it upon her 2019 resignation. As later noted by the trial court, the Wage Act and breach-of-contract claims were "alternatively-pled claims" in that they each sought the same damages.

¶ 5        On February 18, 2020, MARCorp filed the operative answer, affirmative defenses, and counterclaim. As to affirmative defenses to both claims, MARCorp argued: (1) McBain breached her fiduciary duty and/or duty of loyalty by taking away a business opportunity from MARCorp when she, along with others in MARCorp's management team, invested in a brewery known as Beer Church; and (2) any award to McBain should be offset by $50,000 plus 2% interest in recognition of an outstanding loan from MARCorp to McBain.

¶ 6        MARCorp raised two counterclaims in relation to Beer Church: (1) breach of fiduciary duty and/or duty of loyalty; and (2) tortious interference with a prospective economic advantage

2

(not at issue on appeal). MARCorp also raised two counterclaims in relation the alleged $50,000 loan: (1) breach of contract; and, alternatively, (2) unjust enrichment (neither of which are at issue on appeal).

¶ 7 On December 16, 2021, the trial court denied cross-motions for summary judgment. On September 20, 2022, the trial court began conducting a three-day simultaneous bench and jury trial. The court would decide McBain's Wage Act claim (and corresponding affirmative defenses). The jury would decide all remaining claims (and corresponding affirmative defenses). We first set forth the testimony pertaining to the general organization of MARCorp and to McBain's breach-of-contract and Wage Act claims. We then set forth the testimony pertaining to McBain's alleged breach of fiduciary duty based on her investment in Beer Church.

¶ 8 A. Testimony Pertaining to McBain's Breach-of-Contract and Wage Act Claims

¶ 9 1. Michele McBain

¶ 10 McBain testified that she earned a B.S. in accounting from University of Illinois, passed the CPA examination, earned an MBA from Northwestern University, and had been working in the financial industry for 30 years. McBain had been employed as controller or chief financial officer (CFO) for various business entities. She began working for MARCorp in 2014 in the role of CFO.

¶ 11 MARCorp is a private equity company providing financing for other companies. MARCorp had investments in the following types of companies: medical device, IT, drones, Fin-Tech, and event services. MARCorp had "robust criteria" for the companies in which it invested. It wanted control of the companies' management, or at least involvement in the companies' management. It wanted access to the companies' "financials." MARCorp's smallest investment in a single company had been $400,000. Its largest had been $7.5 million.

3

¶ 12    McBain had reported directly to Jeff McCoy (who passed away in 2021). McCoy was a partner at MARCorp and a 1% owner. Michael Fazio was the CEO and chairman (and the trust for the benefit of his children, of which he was the trustee, was a 99% owner of MARCorp). McBain was not listed as an officer in MARCorp's operating agreement. To her knowledge, she was never elected as an officer nor represented as an officer in the board meeting minutes.

¶ 13    In her role as CFO for MARCorp, McBain was "in charge" of the accounting. She prepared financial records to send to outside accountants. She managed the line of credit with the bank, which required her to prepare reports on collateral monthly and provide borrowing base certificates as well as quarterly and annual financials. She "priced deals" for an affiliated company called Services Capital.

¶ 14    Day-to-day, McBain shared office space near McCoy, Joe Lyons, and Lisa Schelli. Lyons, an attorney, worked as an independent contractor for MARCorp. Schelli performed financial work but had less seniority than McBain. McBain also worked with Gary Cullen and John McNally, who performed due diligence for MARCorp and came into the office several times per week. Fazio, who lived in London and later Texas, came into the office three to four times per year.

¶ 15    Typically, McBain was in the office weekdays from 8 a.m. to 5:30 or 6 p.m. McBain also worked additional hours at home. She worked approximately 50 to 60 hours per week. McBain served as the point of contact for anyone who might need to review documents outside of work hours, including on the weekend. As a result, McBain brought home her work-issued laptop. McBain's work-issued laptop was her only laptop; she did not own a personal laptop.

¶ 16    McBain did not view it as her role at MARCorp to develop investment opportunities and this was not a requirement of her employment. She was not the face between MARCorp and prospective companies. However, if the managers of the prospective companies came into the

office, and she was available, she sat in on the meetings. She also performed due diligence when asked, but she did not perform due diligence on every deal. Due diligence included a review of existing leases and contracts, financial documents, assets, liabilities, and tax returns.

¶ 17        Only Fazio and McCoy made the ultimate decision to invest in a company. Once that decision was made, an outside law firm prepared loan documents such as a loan and security agreement or promissory note. After a deal was finalized, McBain studied the loan documents so that the investment would be accurately accounted for in MARCorp's financial records.

¶ 18        Before joining MARCorp, McBain had a series of telephone conversations with Fazio. Fazio offered McBain a "low" base salary (ranging from $90,000 to $115,000 from 2014 to 2018) that would be "heavily" bonused annually (reaching $240,000 at the highest). The agreement was not memorialized in writing, but McBain considered this allocation of salary and bonus typical in a private equity firm. The bonus would be based on profits that MARCorp earned during the past year and would consider transactions that were likely to occur in the coming year. Setting aside the $20,000 bonus for the partial year worked in 2014, the bonuses ranged from $45,000 to $240,000 per year between 2015 and 2018. The bonuses for a given calendar year of work were announced in February of the following year. The bonus for 2014 was announced and paid out in February 2015.

¶ 19        McBain recorded everyone's bonus on MARCorp's monthly financial statement. A bonus, whether deferred or not, would be shown on the income statement as an expense. It would be shown on the balance sheet as a liability. Once a bonus is included on the balance sheet as a liability, it is an earned bonus.

¶ 20        In 2016, MARCorp made a "sizable profit" from its investment in a medical device company. However, when Fazio told McBain in February 2017 the amount of her 2016 bonus, he

5

also told her there that, for the first time, a portion of it would be deferred. The bonus for 2016 was $240,000. Fazio paid $160,000 of the $240,000 in February 2017, within the timeframe for bonus payments in past years. Fazio deferred payment of the remaining $80,000. Fazio explained that MARCorp would receive additional monies from the profits on the medical device company in the following year. However, McBain's knowledge of MARCorp's financials led her to believe that MARCorp had the funds to pay out her bonus in total. Although Fazio informed McBain of the deferment, he did not inform her that she would need to remain employed to receive it. In February 2018, Fazio paid McBain $116,401 in bonus payments for the 2017 work year and deferred another $11,513 for the 2017 work year. Also in February 2018, Fazio paid $35,000 on the 2016 and 2017 deferred bonuses, leaving $56,512 remaining ($80,000 + $11,513 - $35,000 = $56,512). (It is not entirely clear from the record whether the $35,000 in deferred payments was part of, or in addition to, the $116,401 in 2018 bonus payments.)

¶ 21    In February 2017, when she first learned that a portion of her 2016 bonus would be deferred, McBain began to pursue a written employment agreement. These discussions continued for over one year. In August 2018, Fazio asked McBain to stay for 90 days while he and McCoy attempted to put her employment agreement in writing. McBain was paid a $150,000 "stay bonus." McBain testified: "A stay bonus is a bonus that is paid that's above and beyond the regular earned bonuses that an employee would receive and it is to have someone stay for a certain period of time. So I was given a stay bonus and I was asked to stay for 90 days." Neither Fazio nor McCoy ever referred to the stay bonus as an advance or a loan. Nor did they suggest that the stay bonus would offset the portions of the unpaid earned bonuses. Ninety days later, Fazio did not submit a draft written agreement for McBain's consideration.

¶ 22    Instead, on February 14, 2019, Fazio issued the 2018 compensation sheets. McBain's 2018 compensation sheet provided in relevant part:

"[McBain] 2018 Compensation Sheet

| | Base | Bonus** | Other* | Total |
|---|---|---|---|---|
| [McBain] | 115,000 | 225,000 | 2,500 | 342,500 |

\* Benefits
\*\* Total Bonus for 2019

Bonus Payment

| | Current | Prev Def | Subtotal | Previous Pyt | Total Paid |
|---|---|---|---|---|---|
| [McBain] | -- | 38,838 | 38,838 | 150,000 | 188,838 |

New Deferred Schedule***

| | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|
| [McBain] | 38,838 | 28,838 | 25,000 | 92,675 |

\*\*\*To be paid in February of each year should person be employed

| | |
|---|---|
| Previous deferral | 56,513 |
| Payments | 38,838 |
| 2018 deferral | 75,000 |
| New Deferred balance | 92,675 |

[McBain] Principal Loan Outstanding 50,000."[1]

¶ 23    McBain testified that she understood the $225,000 bonus, designated with asterisks to be the "total bonus for 2019" to be the earned bonus from 2018.

---

[1] The final notation concerning the $50,000 loan outstanding formed the basis of MARCorp's counterclaim for breach of contract. Briefly, MARCorp alleged that it issued McBain a loan and she did not repay it. McBain presented evidence at trial that the $50,000 sum was not a loan but was given to her as an advance on her future carried interest, which she explained as being her share of the anticipated value of pending MARCorp investments. The jury ruled in favor of MARCorp on this claim, awarding it $50,000 plus 2% interest. This claim is not at issue on appeal.

7

¶ 24     Looking down to the "Bonus Payment" section, the category marked "current" meant how much of the earned bonus from 2018 would be paid in 2019. However, that category had a dash, meaning that none of the earned bonus from 2018 would be paid in 2019. The category marked "Prev Def," showing an amount of $38,838, meant that $38,838 of the remaining $56,513 of the deferred bonuses from 2016 and 2017 would be paid in 2019. The category marked "Previous Pyt," showing an amount of $150,000, meant that the $225,000 earned bonus from 2018 would be offset by the $150,000 stay bonus from August 2018. The category marked "Total Paid," represented the sum of the deferred 2016 and 2017 bonuses paid in 2019 and the stay bonus from August 2018.

¶ 25     Also, the chart showed that the "New Deferred balance" was $92,675. It appears that this figure was reached by adding the previous deferral of $56,513 and the present deferral of $75,000 (which, itself, was reached by offsetting the $150,000 stay bonus from the $225,000 earned bonus from 2018; as the "Bonus Payment" section indicated that no bonus would be paid in 2019, this left a present deferral of $75,000) and subtracting the $38,838 of the deferred bonuses from 2016 and 2017 that would be paid in 2019. That $92,675 was set to be paid out in 2020, 2021, and 2022.

¶ 26     In McBain's view, this chart did not make sense:

"Q. Now, that $150,000 though, was that paid in 2019?

A. No, that was paid in August of 2018.

Q. So when it says Total Paid in 2019, [it] looks like that's more than just 2019; right?

A. *Right. That doesn't make sense, correct.*" (Emphasis added.)

8

¶ 27    McBain testified that she was due $242,675. This represents the $225,000 earned bonus from 2018 plus $17,675 from prior years' bonuses that she had earned but had not been paid.

¶ 28    McBain had hoped that a written employment agreement would be released in conjunction with the 2018 compensation sheets. It was not, and this, in combination with Fazio's apparent unilateral change in employment terms (continued employment required to receive bonuses, deferment of the entire 2018 earned bonus, and offsetting the 2018 $150,000 stay bonus against the 2018 earned bonus), prompted McBain to resign on February 19, 2019. She believed that if she continued in her employment, she would be agreeing to Fazio's February 2019 terms. Her decision to resign was based on her own dissatisfaction with the 2018 compensation sheet and was not related to anyone else's decision to resign. She did, however, read a draft of McCoy's resignation letter prior to his sending it.

¶ 29    McBain, McCoy, and Lyons formed a new company, first called NEWCO and later called Buffalo Strategic, with the purpose of servicing the MARCorp investments on their own terms. The negotiations were primarily between Fazio (MARCorp) and McCoy (Buffalo Strategic), but they never were able to come to an agreement as to this concept.

¶ 30    On cross-examination, McBain acknowledged that she was never given anything in writing explaining how her bonus was going to be calculated. Nor was she ever told that she would receive a specific percentage of MARCorp's profits. In some years with negative profits, McBain nevertheless received a bonus. McBain understood the bonus was earned when it was written on the compensation sheet. She received a compensation sheet every year. From an accounting standpoint the bonus is earned (because it is put in the books as a liability). She agreed, however, that a bonus that has been put on the balance sheet as a liability can have other conditions attached to it.

## 2. Joe Lyons

Lyons testified that, when MARCorp engaged him, he owned his own law firm and was a solo practitioner. Lyons maintained his separate practice while working for MARCorp, with MARCorp's consent. MARCorp paid Lyons a $10,000 and, later, a $12,500 monthly retainer, with the expectation of a bonus.

Lyons's 2016 bonus, announced in 2017, was deferred. His understanding was that "I had earned it and it was mine." Also, he thought he was going to be paid "within the year." This did not happen and when, the next year, it appeared that the deferred bonus would be spread out over a couple of years, Lyons "got a little concerned." Lyons wanted his pay structure documented.

The lack of pay structure documentation hit a "fever pitch" in August 2018, and Fazio gave Lyons a stay bonus in exchange for staying 90 days. The pay structure was supposed to be documented within that time, but Fazio failed to do so. In February 2019, Fazio released the 2018 compensation sheets. Lyons did not consider this an agreement as to pay structure, "It was just a sheet." Lyons knew McBain was unhappy with her 2018 compensation sheet, but he did not know that she was going to resign until the day before she did so.

On cross-examination, Lyons acknowledged that he was a party to a lawsuit against MARCorp for breach of contract concerning his bonus payment. MARCorp counter-sued him for breach of fiduciary duty.

## 3. Michael Fazio

Fazio testified that he had an accounting degree and obtained his MBA from Pace University in 1983. He worked for Arthur Anderson for 16 years, where he made partner. Deutsche Bank recruited him to be its COO for the Americas, and Fazio accepted the position. He then worked as a managing director for Houlihan Lokey, an independent investment banking firm,

10

for 13 years. He performed mergers and acquisitions and restructuring during the financial crisis (of 2008). He started MARCorp while still working for Holihan Lokey.

¶ 38 Fazio testified to his 2014 pre-hire discussions with McBain. They discussed his vision for MARCorp and McBain's responsibilities for MARCorp. Fazio envisioned that McBain would work 37.5 hours per week, perhaps more when it was "crunch time." Further:

"I think she was hired at $90,000 initial base salary and the discretionary bonus— we hope that we're successful and can pay for bonuses, but, you know, we don't know until we're—you know, work out the operations and make investments and, you know, have profits off of those investments. So there is no promise. We don't know what the operations are going to entail."

¶ 39 According to Fazio, a discretionary bonus meant that he could award $0 or "a few" million. Fazio determined the bonus by looking at the overall performance of the company, whether the objective of growing the company into a larger private equity firm was being met, and what might be reasonable in his mind as growth toward a sizable private equity firm continued. Fazio could award a bonus even in a year where the company lost money. There was no specific formula.

¶ 40 In January 2017, Fazio changed "how the discretionary bonuses were paid out." He explained:

"In January of 2017, we sold [a medical device company] and so we had a large gain. So when you have a large gain in the portfolio *** and if your objective is to grow your firm, if you paid everybody bonuses all on day one, you're susceptible to leaving. So what you do is you condition—you pay some current and we paid a very hefty amount current, but then you defer a portion of the bonus to incent them to stay and grow the company over the next three, four years[.]"

11

¶ 41    Fazio testified to McBain's August 2018, $150,000 stay bonus:

"Q. And why was that stay bonus provided to Ms. McBain?

A. Well, management was somewhat concerned *** that we didn't have documentation associated with their compensation, full documentation of all the compensation, all the arrangements, and so *** the stay bonus was provided so that they would stay until [McCoy] and I could work out the compensation arrangements and the definition of what we're going to do going forward[.]

Q. And what were the terms surrounding the stay bonus?

A. That [McBain] had to be there for 90 days.

Q. Anything else?

A. No."

Also,

"Q. At any point, did you tell [McBain] that this stay bonus was going to be offset by any future bonuses?

A. No."

¶ 42    Fazio testified to the 2018 compensation sheets that he created. These sheets were his "attempt to start trying to put stuff in writing while other terms were being negotiated." He stated:

"Q. What does this document summarize?

A. *** McBain's total compensation from a [GAP] accounting standpoint was $342,500.

Q. And how did you get that number?

12

A. There's a base component of $115,00 which was [McBain's] base pay. *There is a discretionary bonus of $225,000.* And there were other benefits of about $2500.

Q. And *** what made up that 225?

A. The 225 is made up of a couple components. First, it's the stay bonus, so the 150 stay bonus. It's also the current bonus if you were to—if there was a number in there, there is a zero so her current bonus was zero and there was a deferral of $75,000. And so if you add those three numbers, that's 150 and 75 is 225,000." (Emphasis added.)

¶ 43    Fazio testified to the continued-employment term:

"Q. *** What does it say next to [those] asterisks?

A. To be paid in February of each year should person be employed.

Q. Was this a new term you added?

A. No.

Q. Was this a term that was in place from day one of [McBain's] employment?

A. Yes.

Q. And, again, these discretionary bonuses, you have full authority on what was paid, how it was paid, to set the terms and conditions, right?

A. Absolutely."

Although he had always imposed a continued-employment requirement, the first time he wrote it down was on the 2018 compensation sheet.

¶ 44    On February 19, 2019, Fazio received resignation letters from McBain, McCoy, Lyons, McNally, and Schelli. Fazio was "shocked." Fazio engaged in negotiations with his former management team (McCoy, McBain, and Lyons), now Buffalo Strategic, concerning a services

13

agreement. The former management team sought $55,000 in monthly fees (to be divided amongst them). (It appears that they also wanted a certain percentage of the profits.) They also sought a release from liability for any prior misdeeds while at MARCorp. This latter point, in particular, proved to be a sticking point for Fazio and negotiations fell apart.

¶ 45 When questioned by McBain's attorneys, Fazio agreed that he sent a June 21, 2018, email, to McCoy, in which he labeled the continued-employment requirement as an "open item." Fazio nevertheless maintained that that "has always been the agreement."

¶ 46 B. Testimony Pertaining to MARCorp's Breach of Fiduciary Duty Claim

¶ 47 1. Michele McBain

¶ 48 McBain testified to her personal investment in a corporation called Beer Church Hospitality. Beer Church ran a brewery in New Buffalo, Michigan and was owned by Lyons's friend. In early 2018, McBain, along with McCoy and Lyons, each invested $87,333 for a total of $262,000 in Beer Church. The three formed a corporation for the purpose of the investment, "Holy Hops," merely because a liquor license was involved. Holy Hops was not a private equity firm. It was "a corporation forum to hold a passive investment."

¶ 49 McBain used her MARCorp issued laptop in her communications with Beer Church. That was her only laptop. McBain spent a maximum of two hours per month on the Holy Hops/Beer Church investment. McBain had never signed a restrictive covenant or non-compete agreement with MARCorp. Fazio never asked McBain to perform due diligence on Beer Church.

¶ 50 In any event, McBain did not believe Beer Church would have been a suitable investment for MARCorp. MARCorp "never invested in restaurants or breweries." MARCorp typically placed "robust conditions" on the companies in which it invested, seeking a high level of control over the company, such as a board seat and access to the company's financial documents.

14

However, Beer Church was looking for "friendly dollars," meaning it was looking for a passive investor who would not interfere with its business decisions. Beer Church had its own accountant. Further, MARCorp did not invest in companies seeking the comparatively low loan amount initially sought by Beer Church—$300,000 to $450,000.

¶ 51 As time went on, however, Holy Hops invested additional monies in Beer Church. It did this because Beer Church was not having success as planned and, if other investors invested more money than Holy Hops, those investors would "have rights" over Holy Hops. In the end, Holy Hops invested $1,477,000 in an effort to protect its initial investment.

¶ 52 Holy Hops ultimately sued Beer Church, because Beer Church took on additional debt without informing Holy Hops; Beer Church had payroll liabilities that they did not have "on the books"; and Beer Church was delinquent on a tax liability. Holy Hops and Beer Church settled, with Holy Hops earning just $120,000 over their total $1,477,000 investment.

¶ 53 In comparison, during 2018, MARCorp invested approximately $20 million in various companies, including $7.5 million to a "FinTech" company, $7.5 million to Capitol Depot, $2.35 million to an event planning company, $2 million in Mark UAS, and $800,000 in a drone company. McBain considered 2018 to be a "very busy" year for MARCorp, "many" of its investments made money, and other investments were set to be sold at a later date.

¶ 54 It was McBain's understanding that Fazio was aware of her investment in Beer Church:

"We all went out to lunch [at Giordano's] several months after we [McBain, McCoy, and Lyons] had invested. And we—it was myself, [Fazio], [McCoy], and [Lyons]. And we talked openly about Beer Church, about the construction, when it was going to be done, when it was going to be open, those types of conversations."

15

¶ 55    During cross-examination, McBain testified to exhibit No. 21, the first promissory note between Holy Hops and Beer Church. The $262,000 loan set forth an 8% interest rate. It also provided Holy Hops with conversion rights against Beer Church. If Beer Church did not pay its loan, Holy Hops could pursue an ownership interest in Beer Church. Following the initial loan of $262,000, there was an option for a 13% ownership and following the total loan amount of $1,477,000, there was an option for a 49% ownership. Holy Hops never exercised these conversion rights. McBain agreed that, in the second promissory note, Holy Hops inserted a requirement that Beer Church must obtain Holy Hops's permission before taking out additional debt.

¶ 56    McBain never personally told Fazio that she had invested in Beer Church. McBain never saw any emails or documents where Fazio was alerted to Holy Hops's investment in Beer Church. McBain never saw any emails or documents where Fazio affirmatively stated that MARCorp was not interested in investing in Beer Church. Although the group's investment had been discussed over lunch in front of Fazio, it was not specified that McBain had invested in Beer Church.

¶ 57    During redirect examination, McBain clarified that, when Holy Hops began investing in Beer Church, McBain did not intend or think that Holy Hops would ultimately invest over $1 million. Holy Hops did not use their conversion rights against Beer Church, because "it was not a good investment."

¶ 58    Regarding the Giordano's lunch with Fazio, when Beer Church was discussed: "Michael was asking questions to all of us about how our investment was, when *** Beer Church was going to open up, how is construction going. He was asking all those questions. So yes, it was a collective, like *our* investment." (Emphasis added.)

¶ 59                                    2. Joe Lyons

16

¶ 60 Lyons testified to his investment in Beer Church. The owners were friends of his friends from his days at Hope College in Michigan. Fazio noticed Beer Church materials on Lyons's office desk and the two began to talk. Lyons, Fazio, and Cullen decided to make the 90-minute drive to Beer Church that weekend. Fazio's behavior at Beer Church made Lyons "uncomfortable." Lyons explained:

> "[Fazio] came in, had a lot of opinions about the way things were—should be. You know, everything from the open sign or the flag down to how they should have it laid out, what furniture they should have, what food they should serve, what beer they should serve. You know, it was a little overbearing."

When they sat down to talk with the owners, Fazio asked "a litany of questions about their personal finances *** and made some inquiries that were *** beyond what at least I was aware they were looking for."

¶ 61 On the car ride home, Fazio said: "[T]hey don't know what the heck they're doing. We could give them a million and a half and take the whole thing." Lyons told Fazio that was unreasonable and, while he may not have said so, Lyons took offense. After that meeting, Lyons did not want Fazio to be involved in the Beer Church deal.

¶ 62 A week or so after the trip, Fazio sent Lyons an email about a London brewery in which he had personally invested as a point of comparison. However, Fazio did not expressly ask Lyons to perform due diligence on Beer Church on behalf of MARCorp. McBain was not included on the email.

¶ 63 Lyons did not think that Beer Church was a good investment for MARCorp. At the time Lyons himself initially invested, Lyons believed that Beer Church needed approximately $300,000—a small investment by MARCorp standards. Also, MARCorp typically considered the

business aptitude and connections of the owners. For example, MARCorp invested in a drone company partially because the president was "very known in the industry." MARCorp invested in an event planning company partially because the large conventions it hosted could lead to other opportunities. Also, the Beer Church owners were "very resistant" toward relinquishing any sort of control.

¶ 64 Lyons believed that Fazio knew, prior to Lyons's investment, that Lyons was planning to invest in Beer Church. In mid-February 2018, McCoy told Lyons and McBain that he (McCoy) told Fazio that Lyons and McBain would be investing in Beer Church.[2] In addition, after Lyons had invested, Lyons personally told Fazio that he, McCoy, and McBain had invested in Beer Church. This conversation occurred in February or March 2018 while in a car with Fazio and McCoy. Lyons kept Beer Church beer in the office refrigerator, and, occasionally, Fazio would ask about Beer Church. Lyons "knew" that Fazio followed Beer Church's social media. In August 2018, Fazio again indicated that he was aware that Lyons, McCoy, and McBain had invested in Beer Church. This occurred at a group lunch at Giordano's at which all four persons were present. During the conversation, Lyons discussed that the investment amount had increased and there were issues with the buildout. During none of these 2018 conversations did Fazio tell Lyons that he was not allowed to invest in Beer Church or that the investment should have been on behalf of MARCorp.

¶ 65 Initially, Lyons, McCoy, and McBain, through their company Holy Hops, invested $262,000 in Beer Church. Eventually, the group invested more, as construction did not go as planned. Still, further funds were needed as it began to look like Beer Church was a bad

---

[2]The trial court ruled that Lyons was not an interested party under the Dead Man's Act and therefore could testify to his conversations with McCoy.

investment, and Holy Hops sought to protect its initial investment. In the end, Holy Hops negotiated with Beer Church to receive their money back, plus some interest. Although Holy Hops's loan to Beer Church came with conversion rights, Holy Hops never exercised those rights. In the beginning, Holy Hops did not exercise its conversion rights because that was not the spirit of the investment: "the impression we had is that these folks this was their dream. They didn't want to give up control." Later, Holy Hops did not exercise its conversion rights because Beer Church no longer appeared to be a good investment.

¶ 66 On cross-examination, Lyons agreed that no one at Beer Church told him that they did not want to do business with Fazio. Lyons later clarified, however, that Beer Church's owners were not informed that Fazio wanted to "take the whole thing."

¶ 67 Lyons also testified that Beer Church's owners emailed Lyons their sales information, and Lyons forwarded that email to Fazio. Further, while he informed Fazio that he invested in Beer Church, he did not inform Fazio that he formed Holy Hops. Lyons used both his law firm and his MARCorp email addresses in his Holy Hops correspondence. He did not create a separate Holy Hops email address.

¶ 68 On redirect examination, Lyons testified that Fazio asked him to perform document review of investments and assets that were owned by Fazio personally and not MARCorp. Fazio did not pay Lyons for this work outside of his MARCorp salary. The court overruled Fazio's objection as to relevance. The court allowed "a little leeway" to the extent that Lyons's testimony informed the question of whether Fazio created a work culture that tolerated the use of MARCorp resources in personal investment matters.

¶ 69                                      3. Gary Cullen

¶ 70    Cullen, an attorney, worked as an independent consultant for MARCorp from March 2017 to January 2018. Cullen performed due diligence, reviewed documents, and provided legal assistance for MARCorp.

¶ 71    Cullen accompanied Fazio and Lyons on the December 2017 visit to Beer Church. The trio discussed a possible investment with the owners. Cullen got the impression that the owners were not looking for any sort of assistance in running their operation. Cullen sensed that Fazio made the owners uncomfortable. Fazio asked the owners about their requirements for financing and getting the operation up and running, but Fazio also asked the owners about their personal finances, their car loans, and their credit card balances. Fazio suggested that "any financing that he might be involved with should also finance all their personal indebtedness."

¶ 72    On the car ride home, Fazio stated to Cullen and Lyons that he was "interest[ed] in providing as much debt financing as possible and [Fazio] went so far as to say that *** their business would be ripe for taking it over when they couldn't pay back the debt." Lyons responded to the effect of "Boy, the last thing I want to do is take this operation away from my friend."

¶ 73    After the trip to Beer Church, Fazio did not ask Cullen to perform due diligence. Cullen did not believe that Fazio ever talked to him about Beer Church again, "keeping in mind, [however], that [Cullen] dissociated [himself] from MARCorp *** shortly after that."

¶ 74                                4. John McNally

¶ 75    McNally worked as an independent contractor for MARCorp from September 2017 to February 2019. He performed due diligence on behalf of MARCorp and reported to Fazio and McCoy. Fazio never asked McNally to perform due diligence on Beer Church. McNally left MARCorp voluntarily. He did not believe it had a future, because Fazio and McCoy did not see eye-to-eye.

¶ 76    On cross-examination, McNally testified that he spoke "a couple of times a day" with Fazio, mostly brief conversations. McNally spoke with Lyons about Beer Church, but he never spoke with McBain about Beer Church.

¶ 77                    5. Michael Fazio

¶ 78    Fazio testified that, in December 2017, Lyons presented him with the Beer Church opportunity. The opportunity very much piqued Fazio's interest on behalf of MARCorp: "[I]t's structured right and I had looked at some of their presentation. It was a great concept. If you just think about having a brewery in an old church." Soon after December 2017, Fazio, Lyons, and Cullen drove to Beer Church and spoke with the owners regarding financial needs, projections, and due diligence. The meeting lasted several hours. During the car ride home, Fazio "strongly" conveyed his interest in Beer Church to Lyons and Cullen. The three discussed the mechanics of the potential investment, including how to address Beer Church's debt. Fazio opined that he thought a $1.2 to $1.5 investment was necessary.

¶ 79    After visiting Beer Church, Fazio did "a lot" of research on breweries and "very little" due diligence. However, he communicated to Lyons that he expected due diligence on the Beer Church opportunity. He did not believe he communicated to McBain that he expected due diligence on the Beer Church opportunity. Still, he believed that McBain knew that he had visited Beer Church because he expensed the miles to MARCorp.

¶ 80    Months later, at a business lunch that included Lyons and McCoy and a few clients, Fazio learned that Lyons had personally invested in Beer Church. Lyons told Fazio that "the management team concluded that it was too small for MARCorp and they only needed a couple hundred thousand." Lyons left Fazio with the impression that only he (not McCoy and McBain) had invested in Beer Church. Fazio did not learn that McBain had invested in Beer Church until

21

six months after she left MARCorp. Fazio did not learn that McBain, McCoy, and Lyons had formed Holy Hops until that same time.

¶ 81    Fazio testified to whether Beer Church would have been an appropriate investment for MARCorp. When choosing companies to invest in, Fazio cared about high profit and low risk. Fazio was "agnostic" as to the industry. Fazio disagreed that MARCorp required "control" over a company before investing in it. Fazio defined control as owning more than a 50% interest in the company. However, Fazio provided examples of influence he sought over the companies in which he invested: covenants concerning how the company manages debt, board seats ("a lot of times"), and one example of owning a 10% interest in a company. In another instance, MARCorp provided a "straight [$7.5 millon] loan off of [the company's] receivables. We didn't have any equity rights on that."

¶ 82    When questioned by McBain's attorney, Fazio agreed that McBain was not a decision maker for MARCorp. For example, on August 14, 2018, he wrote McCoy an email which stated, "Jeff, I'm not copying [McBain] as she shouldn't be involved in the sausage making."

¶ 83                                   C. Jury Verdict

¶ 84    On September 22, 2022, the jury found in favor of McBain on her breach-of-contract claim, awarding her $242,675. It rejected MARCorp's affirmative defense of breach of fiduciary duty and/or duty of loyalty. It found against MARCorp on its counterclaims for breach of fiduciary duty and/or duty of loyalty, tortious interference, and unjust enrichment.

¶ 85    The jury found in favor of MARCorp on its breach-of-contract counterclaim, awarding it $54,064.20.

¶ 86                                D. Trial Court's Ruling

¶ 87 On November 9, 2022, the trial court found in favor of McBain on her Wage Act claim. The court noted three requirements to establish a violation of the Wage Act: (1) defendant was an employer; (2) the parties entered into an employment agreement; and (3) plaintiff was due final compensation under the Act. The first requirement was not in dispute. As to whether there was an employment agreement, the court explained:

"The *** ultimate problem here is the failure of sophisticated business individuals *** to adequately communicate and document clearly in writing. However, the Wage Act does not require *** a formal contract[.] Instead, all that's needed [is] clear, mutual assent without either party unilaterally changing those terms."

Here, the parties agreed that McBain would receive a base salary and that she would be "heavily bonused." The court noted that the mutually agreed to, heavily bonused portion of the wages was discretionary and could fluctuate. The question was whether and when a discretionary bonus becomes "earned" under the Act. To answer this question, the court relied on its credibility determinations as well as the evidence.

¶ 88 The court reasoned that the instant facts fell somewhere between the cases cited by the parties, *Schultze v. ABN AMRO, Inc.*, 2017 IL App (1st) 162140 (McBain), and *Tao v. Simplex Investments, LLC*, 2022 IL App (1st) 211040-U (MARCorp):

"There is clearly no metric, as [in] *Schultze*. This situation is also different than *Tao* because a discretionary bonus can eventually be earned, just as a lawyer, who may earn a year-end discretionary bonus. The bonus amount or whether one is given may be discretionary, but once it is given, it has been earned."

Also, "the mutual assent was to provide a salary and bonus, the bonus is no longer discretionary in this instance, once the employer put the exact amount to be given." The court held that the

23

continued-employment requirement constituted an unenforceable unilateral change after McBain performed the work. ("The mutual assent is that this bonus is for work performed.") The court acknowledged that the continued-employment requirement "might" have been Fazio's intent all along, but his failure to communicate or document the requirement went against his credibility.

¶ 89    The trial court awarded $242,675 in damages, the same amount awarded by the jury in the breach-of-contract action. The court explained that MARCorp admitted on the 2018 compensation sheet that it owed $225,000 for the bonus component of McBain's 2018 compensation. While MARCorp alleged on that sheet for the first time that McBain had to continue employment to receive the bonus, the court found this was not mutually assented to. The court also noted that $17,675 remained due from prior years' deferred bonuses. The court rejected MARCorp's position that the award should be reduced by $150,000, representing the stay bonus that McBain received in August 2018. The court explained that the testimony established that the $150,000 stay bonus was a separate agreement and that McBain complied with the terms of that agreement. There had never been any condition that the $150,000 would offset the bonus component of McBain's 2018 compensation. Further, as a successful plaintiff under the Wage Act, McBain was entitled to 2% statutory interest and attorney fees (which could be proved in a subsequent proceeding.)[3]

¶ 90    The trial court rejected MARCorp's affirmative defense of breach of fiduciary duty and/or loyalty. The court explained that, while McBain had a fiduciary duty to MARCorp, there was no evidence of breach or damages. Moreover, the "credibility of the witnesses supports [McBain's] theory *** that Fazio was not interested in this [Beer Church] investment." Fazio was aware

---

[3]On March 9, 2023, the trial court awarded $133,000 in attorney fees.

24

through his discussions with Lyons that "something was moving forward regarding Beer Church," but Fazio never took issue with that until the instant lawsuit.

¶ 91    Following unsuccessful posttrial motions, including a motion for judgment notwithstanding the verdict (j.n.o.v.), new trial, and a remittitur of damages, this appeal followed.

¶ 92                                II. ANALYSIS

¶ 93    On appeal, MARCorp challenges: (1) the jury's verdict that MARCorp breached its oral employment contract with McBain by failing to pay her 2018 earned bonus, as well as other years' remaining deferred bonuses; (2) the trial court's determination that MARCorp violated the Wage Act on essentially the same basis; (3) the $242,675 damages amount; and (4) the jury's determination that MARCorp did not prove its breach-of-fiduciary duty claim, as well as both the jury's and the trial court's rejection of the same as an affirmative defense to the breach-of-contract and Wage Act claims.

¶ 94    MARCorp's arguments implicate questions of fact, and we will reverse the jury's and the trial court's findings only if they are against the manifest weight of the evidence. *Chicago Investment Corp. v. Dolins*, 107 Ill. 2d 120, 124 (1985) (questions of fact reviewed according to the manifest-weight standard). A verdict or finding is against the manifest weight of the evidence "where the opposite conclusion is clearly evident or where the [findings] are unreasonable, arbitrary, and not based upon any of the evidence." (Internal quotation marks omitted.) *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992). Also, we defer to the trial court's reasonable inferences from the evidence and its findings regarding the credibility of the witnesses. *Gretencord v. Cryder*, 336 Ill. App. 3d 930, 934 (2003). MARCorp argues that we should apply the heightened standard for motions for directed verdicts or j.n.o.v., which the trial court denied. That standard may be met when "all of the evidence, when viewed in its aspect most favorable to the opponent, so

25

overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (Internal quotation marks omitted.) *Maple*, 151 Ill. 2d at 453. However, as we determine that MARCorp cannot meet the manifest-weight standard, we need not consider the heightened standard applied to motions for j.n.o.v.

¶ 95                                    A. McBain's Breach-of-Contract Claim

¶ 96        To establish the existence of a contract, a party must show: (1) an offer and acceptance; (2) consideration; and (3) definite and certain terms. *Hirsch v. Feuer*, 299 Ill. App. 3d 1076, 1082, (1998). To be valid, an oral contract for employment must contain clear and definite terms and be supported by adequate consideration. *Koch v. Illinois Power Co.*, 175 Ill. App. 3d 248, 252 (1988). MARCorp argues that the evidence did not establish that McBain and MARCorp had formed a contract entitling her to her bonus payments, because the terms of the employment agreement pertaining to bonus requirements and parameters were too indefinite to be enforced. MARCorp has the burden of persuading us that the judgment below was entered in error (*Yamnitz v. William J. Diestelhorst Co., Inc.*, 251 Ill. App. 3d 244, 250 (1993)), and, as we explain, it has not done so.

¶ 97        MARCorp likens this case to *Koch*, 175 Ill. App. 3d at 252,[4] which held that "clear and definite language is required as courts should not rewrite a contract by imposing an obligation where none is intended." In *Koch*, the plaintiff alleged that his employer promised him that he would retain his union contract protection against job termination if he accepted a non-union position. *Id*. at 251-52. The plaintiff left his union position and was subsequently forced to resign from the non-union position without, in the plaintiff's view, adequate protections. *Id*. at 251. The trial and appellate courts determined that the plaintiff failed to adequately allege definite and

---

[4]*Koch* has been called into question for its analysis concerning consideration, not at issue here. See *McInerney v. Charter Golf, Inc.*, 176 Ill. 2d 482, 486 (1997). McBain, in turn, cites several Wage Act cases in support of her common-law, breach-of-contract arguments. Neither of these discrepancies impact our analysis.

26

certain terms concerning protections against job termination. *Id*. at 252 ("he was unable to state anything more specific than the idea he was to have the same protection he had had while in the union."). The court could not enforce an agreement that it would have to restructure with new, more definite terms. *Id*.

¶ 98 MARCorp argues that, as in *Koch*, McBain's allegations concerning an agreement for "heavy" bonus payments is too vague to be enforced. It also asserts that, because Fazio had the discretion to determine the amount of the bonus payment, including issuing a bonus of $0, McBain could not seek to enforce payment of a bonus. It further argued: "McBain agree[s] [that Fazio had the discretion to determine the amount of the bonus payment], testifying that a bonus is not 'earned' until it was calculated at [Fazio's] discretion and presented to an employee."

¶ 99 Even if we were to accept for the purpose of analysis that Fazio could, in his *reasonable* discretion, award a bonus of $0, MARCorp's argument fails to distinguish the facts here from a situation where a bonus amount is yet to be announced. This is not a case where McBain resigned in December 2018, before her bonus was awarded, and sought to enforce the payment of some undefined bonus. Rather, this is a case where McBain resigned after the announcement of her bonus. In its own argument, MARCorp has stated that there was some evidence, such as McBain's testimony, that, once a bonus was announced, it was earned. Lyons testified similarly. Further, McBain testified that, once the bonus for the prior year was declared on a compensation sheet, it entered MARCorp's books as a liability.

¶ 100 MARCorp next argues that, even if the bonus amount was sufficiently definite to enforce payment, there was no breach. In MARCorp's view, it was not required to pay McBain her bonus because "McBain knew the consequence [that] leaving MARCorp [would have] on her deferred bonus payments and chose to leave regardless." In support, MARCorp highlights Fazio's

27

testimony that MARCorp had always imposed a condition of continued employment as part of its overall goal to retain employees and incentivize them to stay with the company and that McBain understood this.

¶ 101    However, Fazio's testimony in this regard is subtly undermined by his own earlier testimony. When initially recounting the bonus terms he laid out for McBain when he hired her in 2014, Fazio did not describe a continued-employment term. While Fazio circled back to this term in later testimony, the continued-employment requirement is inconsistent with the $150,000 stay bonus. Fazio's testimony is contrary to that of McBain and Lyons, who testified that that they were never informed as to the condition of continued employment until it was stated on the 2018 compensation sheets. Fazio's testimony is also undermined by the June 21, 2018, email, where Fazio labeled the question of continued employment an open item.

¶ 102    At oral argument, in apparent recognition that at least some evidence supported that the continued-employment condition was announced for the first time in 2019, MARCorp argued that McBain accepted that condition when she accepted a $38,838 bonus payment. As McBain responded at oral argument, the $38,838 bonus payment she received represented bonuses earned in 2016 and 2017 and were independent of new terms imposed in 2019. See *supra* ¶ 24.

¶ 103    The trial court for its part expressly stated that Fazio was not credible on the issue of continued employment and the jury may have reasonably found the same. MARCorp has failed to persuade us that the jury's determination that MARCorp breached its employment contract with McBain was against the manifest weight of the evidence.

¶ 104                                    B. Wage Act

¶ 105    To avoid the damages award, MARCorp must also persuade us that it did not violate the Wage Act. The Wage Act allows employees to sue for timely and complete payment of earned

wages or final compensation. *Schultze*, 2017 App (1st) 162140, ¶ 22. Final compensation "shall be defined as wages, salaries, earned commissions, *earned bonuses*, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the [two] parties." (Emphasis added.) 820 ILCS 115/2 (West 2020). The "employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." *Id*. § 5. Under the Wage Act, a successful plaintiff is also entitled to 2% monthly interest and attorney fees. *Id*. § 14.

¶ 106    Here, the parties do not dispute that McBain was an employee and MARCorp and/or Fazio was an employer under the Wage Act. Instead, the parties dispute whether the $225,000 bonus was an "earned bonus" as well as the terms of McBain's "employment contract or agreement." Courts deciding Wage Act cases have relied on the Illinois Administrative Code for its interpretation of the terms "earned bonus" and "employment agreement." See *Schultze*, 2017 IL App (1st) 162140, ¶ 23 (employment agreement); *McLaughlin v. Sternberg Lanterns, Inc.*, 395 Ill. App. 3d 536, 544 (2009) (earned bonus).

¶ 107    Under the Wage Act, an employment agreement is more expansive than an employment contract because "an 'agreement' merely requires a manifestation of mutual assent by the parties without requiring the formalities and accompanying legal protections of a contract." *Schultze*, 2017 IL App (1st) 162140, ¶ 23 (citing Ill Adm. Code 300.450). Employers and employees may manifest mutual assent by conduct alone, including past practice. *Id.*

¶ 108    Section 300.500, title 56, of the Administrative Code discusses earned bonuses:

"A bonus is compensation given in addition to the required compensation for services performed. The Department does not maintain jurisdiction over discretionary or

29

gratuitous bonuses. In order to receive compensation under the Act, the bonus must be earned.

> a) An employee has a right to an earned bonus when there is an *unequivocal promise* by the employer and the employee has *performed the requirements set forth in the bonus agreement* between the parties *and all of the required conditions for receiving the bonus set forth in the bonus agreement have been met*. Unless one of the conditions for the bonus is that the employee be on the payroll at the time of the bonus payout, the bonus is due and owing to the employee at the time of separation." (Emphasis added.)

¶ 109　　As the trial court noted, *Schultze*, 2017 IL App (1st) 162140, is instructive. In *Schultze*, for more than 20 years, the executive received an annual bonus which was calculated according to established methodology, including the amount of bonuses those in similar positions had historically received. *Id*. ¶¶ 29-30. Thus, when the executive accepted a certain position within the company that had previously been bonused at approximately $2 to $5 million, he expected a bonus in that range. Subsequently, he was shocked to receive just a $200,000 bonus. *Id*. ¶ 29. The appellate court held that, based on the parties' past conduct, they had manifested an agreement amounting to an unequivocal promise on the company's part that the executive would be bonused and would be bonused in a certain range. *Id*. ¶ 30. The appellate court affirmed the trial court's $2 million (less $200,000) award plus statutory interest and attorney fees. *Id*. ¶ 38.

¶ 110　　MARCorp attempts to distinguish the instant bonus scheme from the established methodology in *Schultze*. It argues that, here, the alleged substance of the bonus payment plan consisted entirely of McBain's assertion that she was promised to be "heavily bonused" and that this assertion was too vague to demonstrate an assent. To the contrary, the evidence showed that

30

the parties understood that McBain would receive a base salary and a bonus consistent with the private equity market. Although McBain did not testify to her pre-MARCorp compensation packages, she did testify that she had an MBA from Northwestern, 30 years of experience in the financial industry, and had formerly held two different CFO positions. Among other responsibilities, she oversaw the financials for more than $20 million in investments in a single year for MARCorp and worked 50 to 60 hours per week over five years for MARCorp. It is in this context that the Du Page County jury would have considered McBain's testimony that her base salary of $90,000 to $115,000 was "low" and was to be supplemented by a "heavy" bonus.

¶ 111    Equally significant, as demonstrated by the parties' past practice over five years, the earned bonus for a given calendar year was announced the February following the year to which the bonus was attributed. At that time, the bonus was deemed "earned" and was recorded as a company liability. Beginning in 2017, by accepted practice, a portion of the bonus payment was subject to deferment. However, as we have discussed, the parties never *agreed* that continued employment was a condition to receive the payment of a bonus that was reflective of growth, work performed, and other factors from a year that may very well be long past. Instead, McBain resigned when that term was proposed.

¶ 112    MARCorp cites numerous cases for the proposition that an unpromised, discretionary bonus is not recoverable under the Wage Act. However, each of these cases are distinguishable because they involve situations where the employer had not announced the bonus amount prior to the employee's separation. See *Seenu v. Radix Trading, LLC*, 2024 IL App (1st) 231034, ¶ 10 (the company released and distributed quarterly bonus awards two weeks after it terminated plaintiff's employment); *McLaughlin*, 395 Ill. App. 3d at 545 (employee who was terminated in October 2006 was not entitled to a *pro rata* share of his discretionary bonus, which would have been

31

declared in January 2007); *Tao*, 2022 IL App (1st) 211040-U , ¶¶ 3, 8-9 (the employee was fired the day before the company informed its employees of the amount of their bonus; the employee's offer letter had informed her as to her "eligibility" in a "discretionary" bonus plan); see also *Hess v. Bresney*, 784 F.3d 1154, 1162 (7th Cir. 2015) (employee was terminated before the fees which would have formed the basis of his bonus were received by the employer).

¶ 113    The trial court here recognized this distinction when it explained: "a discretionary bonus can eventually become earned." MARCorp does not address this distinction, rendering its reliance on the above cases unavailing.

¶ 114    As we have discussed, the trial court reasonably determined that once the bonus for the prior year was announced, it was earned. There was no discretion remaining to be exercised in determining the bonus amount. The questions of whether MARCorp unequivocally promised McBain a bonus for the year 2018 and whether the amount of that bonus was discretionary are no longer relevant once the bonus is, in fact, awarded. For this case to be like those cited by MARCorp, McBain would have had to quit prior to the February 2019 announcement of the 2018 bonus amount. Crediting McBain's testimony that MARCorp assured her she would be heavily bonused, together with the parties' past performance of significant bonus amounts, MARCorp's February 2019 release of the 2018 bonus amount *was* an unequivocal promise to award McBain a bonus for the year 2018. This finding was certainly not against the manifest weight of the evidence.

¶ 115    MARCorp seeks to escape this result by arguing that McBain did not meet the "required conditions for receiving the bonus set forth in the bonus agreement" and that the condition of continued employment is permissible in the Wage Act context. (Emphasis added.) 56 Ill. Admin. Code § 300.500(a). While imposing a condition of continued employment may be permissible in

the Wage Act context, the trial court's determination that this was not a condition of McBain's bonus compensation (see *supra* ¶¶ 101-03) was not against the manifest weight of the evidence.

¶ 116                                    C. Damages

¶ 117          MARCorp argues that the trial court abused its discretion in denying its motion to remit damages. "Remittitur should not be employed when the award falls within the flexible range of conclusions that can be reasonably supported by the facts." *Miyagi v. Dean Transportation, Inc.*, 2019 IL App (1st) 172933, ¶ 20. The denial of a motion for remittitur is reviewed for an abuse of discretion. *Id.* A court abuses its discretion where no reasonable person would take its view. *Id.*

¶ 118          MARCorp first challenges the $225,000 component of the $242,675 in damages, which the trial court and presumably the jury determined represented McBain's 2018 earned bonus. MARCorp asserts that, the 2018 earned bonus, "at the moment it was made" was expressly conditioned on remaining employed at MARCorp. MARCorp continues that, if it had the discretion to set the bonus at $0, then it also had the discretion to go above that amount with conditions such as continued employment.

¶ 119          The trial court and jury were not required to accept this theory of the case. As discussed, evidence supported that the parties had agreed that McBain would receive a salary and a "heavy" bonus, which, once declared, was earned. The evidence further supported that McBain worked 50 to 60 hours per week in 2018 with the understanding that the bonus announced in early 2019 would be representative of the completed 2018 work year as opposed to being conditioned on future work years. As such, we determine that the trial court's refusal to remit the damages award on this ground was not an abuse of discretion.

¶ 120          MARCorp next argues that McBain's 2018 earned bonus can, at most, be $75,000, because she has already been paid $150,000. Granted, though not clearly articulated by MARCorp, an

*argument* could be made that Fazio intended to award a $75,000 earned bonus. That is, if the $225,000 bonus is not broken down into a $75,000 earned bonus and a $150,000 stay bonus, then the $150,000 stay bonus is not otherwise accounted for in the first line of the 2018 compensation sheet's "Total" amount of $342,500 ($115,000 base + $225,000 bonus + $2500 benefits).

¶ 121    However, other aspects of the 2018 compensation sheet support that Fazio intended to exclude the $150,000 stay bonus from the $225,000 bonus category. For example, the 2018 compensation sheet noted that the $225,000 bonus was the total bonus for 2019, the year in which the 2018 earned bonus would have been announced, according to past practice. The separate $150,000 stay bonus was announced and paid in 2018, so it could not have been part of the $225,000 bonus announced in 2019.

¶ 122    In addition, Fazio himself testified, albeit equivocally, that the $225,000 bonus represented McBain's "discretionary bonus." See *supra* ¶ 42. The $150,000 stay bonus was not a discretionary bonus. There was abundant evidence that the $150,000 stay bonus constituted a separate agreement, the terms of which McBain satisfied.

¶ 123    Accordingly, a reasonable trier of fact could have concluded that declining to award McBain the full $225,000 amount would allow Fazio to improperly alter the separate $150,000 stay agreement through the 2018 compensation sheet. Given the conflicting evidence and the trial court's assessment of Fazio's credibility, we cannot say that the trial court abused its discretion in determining that the $242,675 award could be reasonably supported by the evidence. The trial court's refusal to remit damages was not an abuse of discretion.

¶ 124    D. Breach of Fiduciary Duty

¶ 125    Finally, we address MARCorp's challenge to the jury's determination that MARCorp did not prove its breach-of-fiduciary-duty claim as well as both the jury's and the trial court's rejection

34

of the same as an affirmative defense to the breach-of-contract and Wage Act claims. This claim relates to McBain's personal investment in Beer Church and MARCorp's alleged interest in it.

¶ 126    The elements of a claim for breach of fiduciary duty are: (1) the defendant has a fiduciary duty to the plaintiff; (2) the defendant breached that duty; and (3) the defendant's breach proximately caused the plaintiff's injury. *Lawlor v. North American Corporation of Illinois*, 2012 IL 112530, ¶ 69. As to the first element, a fiduciary duty exists when one person, a principal, manifests assent to another person, an agent, that the agent shall act on the principal's behalf and the agent manifests an intent to so act. *Advantage Marketing Group, Inc. v. Keane*, 2019 IL App (1st) 181126, ¶ 27. Therefore, the question of whether the agent defendant is a corporate officer or an employee is not dispositive; rather, the agent defendant has a duty to act on behalf of the principal in all matters related to the agency and a duty of loyalty to refrain from competing with the principal. *Id.* The nature and intensity of the duty depends in part on the reasonable expectations of the parties at the formation of the relationship. *Id.*

¶ 127    As to the second element, the alleged breach implicates the corporate opportunity doctrine and the prohibition against corporate competition. See *Id.* ¶¶ 23-24. "The corporate opportunity doctrine prohibits a corporation's fiduciary from misappropriating corporate property and from taking advantage of business opportunities belonging to the corporation." *Id.* ¶ 23. A corporate opportunity is one that is "reasonably incident" to the corporation's present or prospective business and is one in which the corporation has the capacity to engage. *Id.* ¶ 35. In assessing whether the corporation has the capacity to engage, or is interested in the opportunity, the trier of fact should consider whether the corporation had an actual or expectancy interest in the opportunity and whether the fiduciary's acquisition of the opportunity would hinder or defeat the corporation's purpose in carrying on or developing the business for which it was created. *Id.* Thus, if a fiduciary

wants to avail himself to a business opportunity that is in the corporation's "line of business," the fiduciary must first disclose and tender the opportunity to the corporation. *Id.* The corporation, in turn, must be given the "opportunity to decide, upon full disclosure of the pertinent facts, whether it wishes to enter into a business that is reasonably incident to its present or prospective operations." *Id.* (internal quotation marks omitted) (quoting *Kerrigan v. Unity Savings Ass'n*, 58 Ill. 2d 20, 28 (1974)). The related concept of corporate competition occurs when the corporate employer already has or is actively seeking to establish a business relationship with a third party only to have its efforts thwarted by its own employees seeking a business relationship with the same third party for their own benefit. *Id.* ¶ 24.

¶ 128     As to the third element, courts have found injury, or at least adequately pled injury, when an employee forms a competing business that solicits and serves the principal's existing customers, employs several of the principal's former employees, or causes annual profits to drop. *Advantage*, 2019 IL App (1st) 181126, 44 (customers); *Veco Corp. v. Babcock*, 243 Ill. App. 3d 153, 162 (1993) (customers, employees, and profits); *Smith-Shrader Co., Inc. v. Smith*, 136 Ill. App. 3d 571, 576-77 (1985) (customers, employees, and profits dropped from $642,000 to $50,000)).

¶ 129     Initially we agree with MARCorp that the trial court correctly concluded that McBain had a fiduciary duty to MARCorp not to usurp a corporate opportunity or compete with it. McBain cursorily notes that she was not an owner of the company nor was she the ultimate decision-maker regarding investments but was merely a member of the management team. However, while the nature of McBain's agency may affect the scope of her duties to MARCorp, the case law nevertheless obligates all employees not to usurp corporate opportunities so as to compete with the principal corporation. See *Advantage*, 2019 IL App (1st) 181126, ¶ 27. That having been said,

the evidence allows for a reasonable trier of fact to determine that MARCorp failed to prove a breach.

¶ 130    McBain presented evidence that Beer Church was not a corporate opportunity for MARCorp, in that an investment in Beer Church would not have been "reasonably incident" to MARCorp's investment goals. Beer Church initially sought less funding than MARCorp typically invested in its companies and Beer Church was less open to outside control than MARCorp typically sought to exert over its companies. Other evidence, however, supported that a Beer Church investment could have been consistent with MARCorp's business interests if MARCorp was able to force a takeover.

¶ 131    Still, even if the triers of fact determined that Beer Church was a corporate opportunity for MARCorp, they would have had to consider whether MARCorp declined that opportunity. The trial court determined that Fazio's interest in Beer Church on behalf of MARCorp had faded upon his initial visit and that Fazio consented to McBain, Lyons, and McCoy's personal investment in the same. The jury was free to make that determination as well. Indeed, while the evidence showed that Fazio made an initial visit to Beer Church with Lyons and Cullen and followed up by sending Lyons an email about the London brewery, McBain, Lyons, Cullen, and McNally each testified that Fazio never expressly asked them to perform due diligence on a potential Beer Church investment. Further, Lyons testified that he had conversations with Fazio regarding his personal investment. Similarly, Lyons and McBain testified that they were present at a lunch wherein Fazio expressed his understanding that the group had personally invested in Beer Church. Never during these conversations did Fazio state that MARCorp, rather than McBain, Lyons, and McCoy, should have invested in Beer Church. While Fazio disputed the characterization of these interactions and conversations, the fact finders were entitled to credit the accounts of McBain and Lyons. As a final

37

point, we are not persuaded by the underlying premise of Fazio's assertion that he did not know that McBain, in particular, as opposed to just Lyons and possibly McCoy, invested in Beer Church. Fazio was aware that some of his employees were investing in Beer Church and that MARCorp was not, supporting McBain and Lyons's testimony that they did not believe MARCorp was interested in the investment. Given this, the record does not support that knowledge of McBain's investment, in particular, would have prompted Fazio to pursue the Beer Church opportunity. Accordingly, the trial court's and jury's finding that McBain did not breach her fiduciary duty was not against the manifest weight of the evidence.

¶ 132                                    III. CONCLUSION

¶ 133          The judgment of the circuit court of Du Page County is affirmed.

¶ 134          Affirmed.